**Miguel FLORES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CM–594.**

District of Columbia Court of Appeals.

Argued Sept. 16, 1996.
Decided Aug. 7, 1997.

---

Michael Volin and Gladys Xiques, Student Attorneys, for appellant. Melissa Goldstein and Bill Joseph, Student Attorneys, and David Reiser, Supervising Attorney, Washington, DC, were on the brief, for appellant. Jennifer P. Lyman, Supervising Attorney, also entered an appearance for appellant.

Heidi L. Rummel, Assistant United States Attorney, with whom Eric H. Holder, United States Attorney, and John R. Fisher, Patricia J. Smoot, and Lilly Ann Sanchez, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and RUIZ, Associate Judges, and PRYOR, Senior Judge.

RUIZ, Associate Judge:

Appellant, Antonio Miguel Flores, was found guilty of simple assault against Lucia Lainez and was sentenced to 180 days, execution of sentence suspended, and a one-year term of probation. As one of the conditions of probation, the trial court ordered Flores to temporarily pay child support for his daughter with Lainez, which the court later entered as a permanent order of child support. Flores presents four issues on appeal: 1) whether the trial court violated his Sixth Amendment rights when it curtailed the cross-examination of Lainez, the government's key witness; 2) whether the trial court conducted an inadequate Jencks inquiry regarding the existence of a prior recorded statement by Lainez; 3) whether the trial court erred when it considered evidence of Flores's prior assaults on Lainez to determine who was the first aggressor in this case; and 4) whether the trial court exceeded its sentencing authority by imposing a permanent order of child support.

We agree with Flores that, under the circumstances of this case, the trial court abused its discretion by limiting cross-examination of the main witness, that it erred by failing to conduct an appropriate Jencks inquiry and that it exceeded its authority by imposing a permanent order of child support. Therefore, we reverse and remand with instructions to vacate the order for permanent child support.[1]

---

1. We affirm the trial court's ruling admitting evidence of two prior incidents of domestic violence between the couple.

## I.

Lainez and Flores, who have a daughter from their relationship, lived together from 1991 until approximately May 1994,[2] when Lainez moved out of the apartment she shared with Flores and into a neighbors' apartment on the same floor. On February 7, 1995, between 5:30 and 5:45 p.m., Flores confronted Lainez in the hallway outside the neighbors' apartment and requested their daughter's social security number in order to complete his income tax return, which Lainez refused to provide.

Lainez testified that Flores assaulted her out of anger when she refused to give him the social security number. Flores blocked Lainez's path and threatened that unless she gave him the social security number, he would not let her pass. When she again refused and tried to pass by him, Flores grabbed Lainez by the neck and began to choke her. Attempting to escape, Lainez scratched Flores's face which caused him to release her. Flores then pushed her to the ground, grabbed both her legs and dragged her into his apartment. As Flores tried to close and lock his door, Lainez's roommate, Marta Juardo, pushed against the closing door and Lainez was able to escape.[3] Moments later, Flores tried to enter Lainez's apartment and threatened to kill her. At this point, Lainez called the police.

Lainez further testified that she gave a statement to the police about the incident, when they arrived that same evening in response to her 911 call. She spoke to Detective Nelson Valdes and noticed that he had a pad in his hands and was writing on the pad while they were discussing the incident. When she was finished, Detective Valdes read what he had written to her, and asked her to confirm its accuracy, which she did. She was never, however, asked to sign the statement. Detective Valdes's written documentation of Lainez's statement was not produced to the defense nor introduced at trial.

Flores testified in his own defense and denied hitting, choking, slapping, scratching, or punching Lainez on February 7, 1995. He testified that Lainez hit him first and that when she turned to hit him again, he pushed her away in self-defense and she fell. As he tried to help her up, she tried to kick him and he "touched" her legs to keep her feet away from him. Flores denied trying to enter Lainez's apartment after the initial confrontation and threatening to kill her. Flores presented evidence that Lainez did not report any complaints on the day of the alleged incident to the building's security guards on duty at the time nor to a twenty-four hour front desk receptionist. The manager of the apartment building confirmed that he did not receive any complaints about the incident.[4]

On rebuttal, Lainez's version of the facts was corroborated by her roommate, Marta Juardo, who with her husband, Enrique Hernandez, had witnessed the attack from the hall outside their apartment as they walked out of the apartment with Lainez on their way to work on the evening of the incident. Lainez also testified on rebuttal about two prior assaults against her by Flores. The first assault occurred in November 1994, when Lainez called the police after Flores hit her in the back and bit her. The second argument had occurred in the summer of 1993 when, due to jealousy, Flores slapped Lainez in the face after having previously threatened to do so.

Trial testimony was presented over two days. On the first day, April 25, 1996, the government presented Lainez as its sole witness. After direct examination, she was cross-examined for about twenty minutes exclusively on a Jencks *voir dire* concerning the statement she gave to the police. The court then recessed because an interpreter was not available to Lainez, who required a Spanish-language interpreter. On the second day, when the trial court reconvened for

---

2. Lainez testified that she moved out approximately eleven months before the trial, which commenced on April 25, 1995.

3. Flores was initially charged with assaulting Juardo. That charge was dismissed.

4. Flores also presented the testimony of his employer, who attested to his friendly nature and to having observed Lainez on another occasion grab Flores's wrist after accusing him of having an affair with a customer.

the defense's substantive cross-examination of Lainez, the government informed the trial judge that no interpreter was immediately available. The trial judge commented that

> cross-examination was not going to go for more than half an hour. And just so that everyone is clear not just for purposes of the interpreter counsel will need to be very aware of time and be succinct in your presentation of your respective cases. But we are going to finish this case today. And I will be listening to the direct examination to see if it is getting right to the point. I will be timing the direct examination. And the cross-examination will follow accordingly. If I find that it's going into matters that are peripheral at best you are going to have to stop and sit down.

An interpreter arrived a few minutes later, and defense counsel began to cross-examine Lainez.[5] The trial court ended the cross-examination after thirty minutes and dismissed the interpreter, noting that the direct examination had taken twenty minutes and that the court had "only asked for [the interpreter] for half an hour." The trial court did not comment on the substance of the cross-examination and refused to hear counsel's proffer on the further questions she intended to ask Lainez.

## II.

▉ Flores contends that the trial court violated his Sixth Amendment right to confront and cross-examine Lainez, who was the sole witness in the government's case-in-chief, when the court abruptly terminated defense counsel's cross-examination. Flores argues that in this case it was unreasonable for the trial court to impose a strict time limitation on the cross-examination of Lainez for a number of reasons. First, Flores was represented by an inexperienced law student, appointed to him by the court; second, even if counsel's cross-examination had not been very compelling, the judge had an obligation to allow counsel to proffer the additional questions she proposed to ask the witness before the trial court could decide to cut off further cross-examination; third, Lainez was the government's most important witness in the case, so her credibility was pivotal; and fourth, the pace and effectiveness of cross-examination was hampered by the difficulties in interpretation and objections by the prosecutor, all of which were beyond Flores's control.

The government contends that the trial court properly exercised its discretion, and did not violate Flores's Sixth Amendment rights, when it terminated Flores's cross-examination of Lainez. Specifically, the government argues that the trial court allowed, overall, fifty minutes of cross-examination[6] and had warned the parties that it required each side's examinations to be succinct and would not tolerate inquiry into peripheral matters. According to the government,

---

5. The cross-examination of Lainez was slow and cumbersome because, among other things, Lainez had trouble understanding some of the questions posed to her. For example, when asked about the numbering of the apartments on her floor, Lainez had difficulty giving a direct answer:

> Q. And that hallway begins with apartment 601, correct?
> A. No, no.
> Q. Ms. Lainez, do you know what numbers are on your hallway?
> A. His apartment is 611. My apartment is 610. His apartment is 612.
> Q. Yes. And before your apartment are there apartments up the hall before yours?
> A. This is mine, another person is here.

At a certain point, the interpreter herself was concerned that Lainez did not understand:

> THE WITNESS: Question what?
> THE INTERPRETER: That was my concern, Your Honor, that she doesn't understand.

There were times when Lainez herself stated that she did not understand.

> Q. And when you were living with Mr. Flores he was working, correct?
> A. Who was working?
> Q. Mr. Flores.
> A. Excuse me, I don't understand.

At one point, the interpreter herself gave an incorrect interpretation, which was corrected by the prosecutor, Ms. Sanchez, who also happened to speak Spanish:

> THE WITNESS: And then I hit him in the face—
> MS. SANCHEZ: That's not the interpretation.
> THE INTERPRETER: I need a clarification from the witness.
> THE WITNESS: He slapped me in the face.

6. The fifty-minute total includes the twenty minute Jencks *voir dire*, conducted the day before substantive cross-examination, on whether notes were taken of Lainez's statement to the police.

Flores had a meaningful opportunity to cross-examine Lainez in depth about the most relevant areas of inquiry: the relationship between Lainez and Flores, the details of the assault, Lainez's prior inconsistent statements to a defense investigator, the layout of the crime scene and potential eyewitnesses. The government further argues that even assuming a violation of Flores' right to cross-examine Lainez, Flores cannot show that he suffered any significant prejudice, as required by *(James) Johnson v. United States*, 398 A.2d 354 (D.C.1979), because Lainez's testimony was corroborated by Juardo and the trial court found Lainez to be credible even after she had been impeached with the testimony of a defense investigator. According to Flores, however, had he been allowed more time, he would have been able to impeach the witness.

▮ The Confrontation Clause of the Sixth Amendment to the United States Constitution gives a defendant the right to confront and cross-examine adverse witnesses. *Akins v. United States*, 679 A.2d 1017, 1021 (D.C.1996); *Ray v. United States*, 620 A.2d 860, 862 (D.C.1993). However, this "right is subject to reasonable limits imposed at the discretion of the trial judge." *Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989). When reviewing a trial court's decision to limit a defendant's cross-examination, "the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial." *Springer v. United States*, 388 A.2d 846, 856 (D.C.1978). This court first determines whether the trial court's decision violated the defendant's Sixth Amendment right to confront the witnesses against him by precluding a "meaningful" degree of cross-examination. *Jenkins v. United States*, 617 A.2d 529, 532–33 (D.C.1992). If so, and if there was a proper objection to the trial court's ruling, this court will review the trial court's action under the harmless constitutional error stan-

dard of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *Jenkins, supra,* 617 A.2d at 533. The question we must answer under the latter standard is whether it is " 'clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony.' " *Jenkins, supra,* 617 A.2d at 533 (quoting *Scull, supra,* 564 A.2d at 1166). Once a constitutional violation has been established, the government has the burden to show that it was harmless. *O'Neal v. McAninch,* 513 U.S. 432, 437, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995) (citing *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828). Where the trial court erred in limiting cross-examination, but the error is not of constitutional dimension, reversal will only be required if we conclude, upon consideration of the totality of the circumstances, that the error caused significant prejudice. *(James) Johnson, supra,* 398 A.2d at 366; *Springer, supra,* 388 A.2d at 856.

The record in this case reveals that one of the trial court's main reasons for setting a thirty-minute limitation on Flores's substantive cross-examination of Lainez was that the court wished to complete the trial that day. The record also reveals limited availability of the official court interpreter, who had been requested for only half an hour in light of the trial court's planned completion of the trial. Unanticipatedly, however, there were serious and recurrent problems with the interpretation of Lainez's testimony during cross-examination and of gaps in her understanding, as noted by the interpreter, witness and prosecutor.

▮ We do not question that trial courts have a measure of discretion to manage their trials by placing limits on cross-examination as a way to deal with the realities of crowded court schedules, including limited interpreter availability.[7] However, any fixed pre-set lim-

---

7. We have recognized that a trial court may restrict the substance of cross-examination:

to prevent harassment, prejudice, confusion of the issues, or repetitive, cumulative, or only

it must be subject to review and modification in order to accommodate a defendant's Sixth Amendment right to confront witnesses against him. *Springer, supra,* 388 A.2d at 855 ("[t]he permissible scope of cross-examination 'must be limited with the utmost caution and solicitude for the defendant's Sixth Amendment rights.)' " (quoting *United States v. Houghton,* 554 F.2d 1219, 1225 (1st Cir. 1977)). In this case, special caution was required because of interpretation-related requirements. Under District of Columbia law, a non-English speaking party or witness has a right to a "qualified" interpreter who will render accurate translations. D.C.Code §§ 31–2701(5), –2702(a) and (b) (1993); *Gonzalez v. United States,* 697 A.2d 819 (D.C. 1997); *Kim Long Ko v. United States,* 694 A.2d 73 (D.C.1997). A defendant's right to present a defense and confront his or her accusers can be impeded not only by an unduly restrictive time limitation on cross-examination, but also by the admission of incorrectly-interpreted witness testimony. *See Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986) (" 'The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense . . . This right is a fundamental element of due process of law.' At times, the right of confrontation and the right to present a defense intersect." (quoting *Washington v. Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967))).

■ In this case, the pre-set time limitation on cross-examination prejudiced Flores because, as a result of difficulties with interpretation, he did not have adequate time to develop his defense by impeaching Lainez. We conclude that the trial court erred when it held trial counsel to a pre-set time limitation, refusing to hear defense counsel's proffers concerning the additional questions she intended to ask Lainez. *Hollingsworth v. United States,* 531 A.2d 973, 982 (D.C.1987). The trial court had no basis, in the face of

unanticipated difficulties with interpretation, to adhere to a unilaterally-imposed predetermined plan without first allowing defense counsel to at least proffer the questions she had not had an opportunity to ask.[8] The government argues that even on appeal Flores has not proffered what the further questions would have been. However, this argument ignores the fact that the trial court did not allow Flores to set forth any proffers, and that we review the claim of error within the bounds of the record developed in the trial court. D.C.Code § 11–721(e) ("On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); *see Davis v. United States,* 482 A.2d 783, 785 (D.C.1984) (noting that where trial court made no inquiry about witness' claim of Fifth Amendment privilege, "the record will not permit us to sustain the ruling of the trial court"), *aff'd en banc,* 564 A.2d 31 (D.C.1989).

Lainez was the key government witness in this case. Her testimony had been corroborated by one eyewitness, her friend, Juardo, and impeached by a defense investigator, John Molina, who had interviewed Lainez for over two hours. Both Juardo and Molina, however, could be viewed as biased, the former for the prosecution, and the latter for the defense. In these circumstances the absence of a record on the substance of the intended impeachment of Lainez is fatal, and we are unable to say that the limitation on cross-examination was not of constitutional dimension. Rather, "[s]ince the proposed cross-examination *might* have led the jury to doubt dispositive testimony against appellant, its exclusion was of constitutional dimension." *Scull, supra,* 564 A.2d at 1166 (emphasis added). "[I]n order to affirm, we must be satisfied that appellant *would* have been convicted, not that he *could* have been convicted;

---

marginally relevant questioning, to avert danger to or the humiliation of a witness, or [to] guard against the danger that counsel will ask highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false.

*Scull, supra,* 564 A.2d at 1164 (citations and internal quotation marks omitted).

8. When the trial court ended counsel's cross-examination, counsel objected on Sixth Amendment grounds and asked to proffer additional questions for cross-examination, to which the trial court responded "No, we don't need that."

this is a test of harmlessness and not of sufficiency." *Id.* Here, the lack of a record, attributable to the trial court's rulings, not only makes it impossible for us to evaluate whether a significant line of inquiry was foreclosed; it also precludes the government from meeting its burden to show harmlessness beyond a reasonable doubt.

Based on the combined facts that cross-examination of Lainez was hampered by problems with interpretation and that Lainez's testimony was important as she was the only government witness in its case-in-chief, we conclude, based on the record before us, that curtailing the cross-examination of Lainez in this case was not harmless beyond a reasonable doubt. Therefore, we reverse. *See O'Neal, supra,* 513 U.S. at 436, 115 S.Ct. at 994 (holding that if in considering a habeas petition a reviewing court is in "grave doubt about whether a trial error ... had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless").

### III.

■ In light of our reversal based on the limitation of cross-examination, we turn to another issue that will come up again, Flores's argument that the trial court must conduct an independent inquiry into the existence of Lainez's recorded statement after Lainez testified that she made such a statement to the police, particularly given that her credibility was critical to the determination of Flores's guilt or innocence.

The Jencks Act, 18 U.S.C. § 3500 (1994), is a " 'narrowly structured scheme designed to regularize and limit the access of the accused to ... extrinsic statements or reports [ ] which may facilitate the impeachment of government witnesses.' " *Bayer v. United States,* 651 A.2d 308, 311 (D.C.1994) (quoting *Middleton v. United States,* 401 A.2d 109, 116 (D.C.1979)). The Jencks Act requires that the government turn over to the defense any prior "statement" of a witness called by the prosecution that relates to the subject matter of the witnesses' direct testimony. If a defendant requests production of reports or statements under the Jencks Act, the trial judge is affirmatively obligated to ascertain

whether the requested items are covered by the Act as producible material and whether they are in the government's possession. *Id.*

Lainez testified that she saw Detective Valdes writing notes as he was questioning her and that he read her statement back to her and asked if she agreed with what he had written down. An arrest warrant affidavit by Detective Valdes based on Lainez's statement was filed on February 9, two days after Ms. Lainez spoke to Detective Valdes. When defense counsel requested Lainez's statement, the trial court asked the government whether it had the statement or had asked Detective Valdes if he had any notes. The government responded that the papering notes indicated that Detective Valdes had been asked about the statement, and that he responded that he did not have any notes. The government argued that any notes taken by the detective would have been incorporated into his affidavit in support of the arrest warrant and that nothing in the affidavit suggested that the notes would have differed from the affidavit.

Based on these representations and arguments, the court declined to make further inquiry over defense counsel's objection that the court had an obligation to conduct "a separate independent inquiry." On appeal, Flores maintains that pursuant to *Moore v. United States,* 657 A.2d 1148, 1151–52 (D.C. 1995), the trial court has a duty to conduct an independent inquiry into the existence of Jencks material once a witness testifies that an officer took notes of a statement.

We agree that in light of Lainez's testimony at trial that the police took notes of her statement, the trial court should have undertaken an independent Jencks inquiry into the existence and location of notes taken by the police of Lainez's statement. *Moore, supra,* 657 A.2d at 1152; *Bayer, supra,* 651 A.2d at 311. The trial court could have called Detective Valdes as a witness, or asked the prosecutor to inquire directly of Detective Valdes or of the Assistant U.S. Attorney who spoke with the detective in the process of papering the case. In view of the importance of the witness at issue, reliance on the notes of an absent papering attorney was not sufficient

to discharge the court's responsibility to conduct an independent inquiry. Further, even though Detective Valdes's affidavit refers to Lainez's statement, there is no support in the record for the government's argument that the substance of the earlier notes was incorporated in Detective Valdes's affidavit prepared two days after the statement was taken.

Flores argues that as in *Bayer, supra,* this court should remand the record to the trial court to give the government an opportunity to either show that there is no statement producible under Jencks or to produce the notes. Alternatively, Flores contends that the case should be reversed and remanded so that he can impeach Lainez's testimony with the substance of the notes (if they are produced) or, contrary to her trial testimony, with their non-existence (if they are not produced). The government concedes that a record remand to conduct a Jencks hearing would be appropriate if this court concludes that the record is inadequate to support a determination that the trial court's failure to conduct an adequate Jencks hearing was harmless error. In light of our reversal on the cross-examination issue, we need not choose between the two alternatives.

## IV.

Next, we address Flores's third issue, that the court erred when it admitted evidence of two prior assaults against Lainez for the purpose of determining whether Flores was the first aggressor during the incident at issue in this case. Pursuant to *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), evidence of Flores's other crimes is presumptively inadmissible, but may be admitted at the discretion of the trial court when it is relevant to motive, intent, absence of mistake, identity or a common scheme. *Id.* at 16, 331 F.2d at 90. We have recognized that evidence of previous hostility between partners is often relevant to malice, motive and intent, and is therefore admissible in domestic violence cases. *See Gezmu v. United States,* 375 A.2d 520, 522 (D.C.1977) (out-of-court statement of deceased concerning husband's prior hostility admissible to show malice or motive of husband during wife's subsequent shooting death).

In order for evidence of other offenses to be admissible, the trial court must find: i) that the defendant committed the other offenses by clear and convincing evidence; ii) that the evidence of the other offenses is directed to a genuine, material and contested issue in the case; iii) that the evidence is relevant to the issue beyond demonstrating the defendant's criminal propensity; and iv) that the evidence is not more prejudicial than probative. *Robinson v. United States,* 623 A.2d 1234, 1238 (D.C. 1993) (citing *Roper v. United States,* 564 A.2d 726, 731 (D.C.1989)). In *(William) Johnson v. United States* we held, with respect to the last factor, that the appropriate balancing test is whether the prejudicial impact of the evidence "substantially" outweighs its probative value. 683 A.2d 1087, 1099 (D.C.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997).

The evidence of two prior assaults admitted in this domestic violence case easily meets the requirements set forth above. The trial court found, by clear and convincing evidence, that Flores committed the two prior assaults against Lainez. In this case, Flores claims he acted in self-defense, thereby putting his mental state at issue; therefore, evidence of past aggressions between the same parties was relevant to material issues, malice and motive, not merely criminal propensity. *Garibay v. United States,* 634 A.2d 946, 948 (D.C.1993). Further, as this was a bench trial, the risk of the evidence having an unduly prejudicial effect on the jury was not present.

Flores contends, however, that only in homicide cases may prior violent acts of the victim be introduced as evidence to prove that the victim was the first aggressor. *Harris v. United States,* 618 A.2d 140, 144 (D.C. 1992). This argument is easily dismissed by *Garibay, supra,* 634 A.2d at 949 n. 8, where this court made clear that the "same principles apply in a criminal prosecution, such as this one, involving domestic violence, though not a homicide, to allow admission under *Drew* of evidence of a prior assault on the same victim as showing motive to rebut a claim of self-defense." Therefore, we conclude that evidence of Flores's prior assaults

against Lainez was admissible, from which the fact-finder could infer that Flores was not acting in self-defense in this case because he had no reason to fear Lainez as it was he who had been the aggressor in past incidents. The evidence was not used to prove Flores's criminal propensity, but to rebut his claim of self-defense.

## V.

■■■ Finally, we consider Flores's argument that the trial court exceeded its sentencing authority when it entered an order requiring him to continue to pay child support until his young daughter becomes an adult.[9] The government concedes that it has found no legal authority to support the court's imposition of a condition of probation that exceeds the term of probation, and requests that the court remand the case for resentencing. *See Thorne v. United States,* 471 A.2d 247 (D.C.1983). We agree that there is no law supporting the trial court's imposition of an order that imposes an obligation that extends beyond the period of probation. Flores contends that because he has already served his entire lawful sentence, he should not be subjected to resentencing that potentially could increase his punishment. We disagree; by having taken an appeal from his conviction, Flores does not have a legitimate expectation in the finality of his sentence, particularly where the sentence imposed is probation. *Fitzgerald v. United States,* 472 A.2d 52, 53–54 (D.C.1984).

We reverse and remand the case to the trial court with instructions to vacate the permanent child support order, without prejudice to Lainez pursuing a civil action to continue to receive child support for their daughter. On remand, if Flores is again convicted, the trial court may sentence Flores according to its judgment at the time. *Barnes v. United States,* 136 U.S.App. D.C. 171, 172, 419 F.2d 753, 754 (1969) (en banc).

*Reversed and remanded.*

---

9. Flores does not dispute his legal obligation to provide child support during the one-year period of probation.