Glenn E. ADAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–145.

District of Columbia Court of Appeals.

Argued March 17, 2005.
Decided Sept. 8, 2005.

Susan H. Rosenau, Washington, DC, appointed by the court, for appellant.

Timothy J. Kelly, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ and REID, Associate Judges.

REID, Associate Judge:

After a jury trial, the appellant, Glenn Adams, was found guilty of the lesser-included crime of second-degree murder while armed, D.C.Code §§ 22–2103, –4502(a) (2001);[1] (2) possession of a firearm during a crime of violence, D.C.Code § 22–4504(b) (2001);[2] (3) carrying a pistol without a license, D.C.Code § 22–4504(a)(2) (2001);[3] (4) carrying a dangerous weapon, D.C.Code § 22–4504(a) (2001);[4] (5) possession of an unregistered firearm, D.C.Code § 7–2502.01 (2002);[5] and (6) unlawful possession of ammunition, D.C.Code § 7–2506.01(3) (2001).[6] He challenges several of the trial court's evidentiary rulings and the sufficiency of the government's evidence. We affirm.

## FACTUAL SUMMARY

The record before us shows that in the early morning hours of January 26, 2002,

---

1. Formerly codified at D.C.Code §§ 22–2403, –3202(a) (1996).

2. Formerly codified at D.C.Code § 22–3204(b) (1996).

3. Formerly codified at D.C.Code § 22–3204(a)(2) (1996).

4. Formerly codified at D.C.Code § 22–3204(a) (1996).

5. Formerly codified at D.C.Code § 6–2311 (1996).

6. Formerly codified at D.C.Code § 6–2361(3) (1996).

Mr. Adams was sitting in his brother's black Nissan automobile, which was parked on the 3100 block of Newton Street, in the Northeast quadrant of the District of Columbia, talking to an acquaintance, Jonathan Silver. A short while later, Mr. Adams exited his vehicle and approached a group of young men who were standing in the center of Newton Street. He asked the group, which included Bernard Brooks, Eugene Thomas, Marquette Brooks, and Donnell Diggins, if they knew where he could find Michael Thomas, the decedent. Some members of the group, including Bernard Brooks, pointed out that Mr. Thomas was standing only a few houses down the street, leaning on a chain-link fence; Mr. Adams walked "up the street" towards Mr. Thomas.

Approximately one or two minutes later, Bernard Brooks and the others in the group, who were walking down Newton Street in the opposite direction from where Mr. Thomas was standing, were startled by the sound of gunfire. Turning around, they saw Mr. Adams "pointing a gun" at an unarmed Mr. Thomas. Mr. Thomas, who was "bending down" in a defensive position, with his arms raised in an attempt to push Mr. Adams away, said: "Go ahead. Go ahead, Glenn. I love you." With his gun pointed at Mr. Thomas, Mr. Adams "shot him." [7] Mr. Thomas spun around and fell to the ground. Mr. Adams "walked up to him and kicked him in the face." Mr. Adams then walked across Newton Street and got back in his car. "He drove down the street towards" the group of men who had just watched the shooting, stopping his car momentarily to yell something inaudible at the bystanders. Mr. Adams then sped away; Mr. Thomas died a short time later of a single gunshot wound.

Prior to his trial, Mr. Adams filed a motion to suppress identification evidence as "unreliable" and "impermissibly suggestive." On November 12, 2002, a hearing was held on Mr. Adams' motion. The government presented the testimony of Detective Gregory Sullivan of the Metropolitan Police Department ("MPD"). Detective Sullivan testified that he interviewed two eyewitnesses on the morning of the shooting. The first witness stated that "the shooter was a man named Glenn," that he had known Glenn for "five or six years." When asked to describe Glenn, the first witness stated that he "was a black male in his twenties, that he had a mustache, goatee, that he had short hair, that he had craters in his face, moles on his face, that he had a big nose, that he had big lips and his lower lip hung down." The second witness also stated that "the shooter was a man named Glenn," and that he had known Glenn for "a couple of years." The description of the shooter provided by the second witness was nearly identical to that provided by the first witness. Both witnesses stated that they had a clear view of the shooting.

Using a computerized database to display the arrest photograph of every male named "Glenn" who had been arrested in the District of Columbia within the "past several years," Detective Sullivan asked the first eyewitness if he could identify the shooter. After reviewing all of the "arrest photos" in the database, however, the first eyewitness was unable to identify the man he saw shoot Mr. Thomas. Detective Sullivan did not ask the second witness to review the photo array created by the District's database. Instead, Detective Sullivan transported the two eyewitnesses to Maryland, where he created a similar display using the arrest photo database for

---

7. Mr. Adams may have been as close to Mr. Thomas as a few inches, or as far away as "three to four feet." The testimony on this point is somewhat inconsistent.

Prince George's County. After looking at approximately ten pages of photographs, with each page containing six photographs, the first eyewitness identified Mr. Adams as the shooter. He was "[o]ne hundred percent sure" that Mr. Adams had shot Mr. Thomas.

After the first eyewitness left the room, Detective Sullivan brought the second eyewitness in and asked him if he could identify the shooter; however, before Detective Sullivan had an opportunity to reset the database, the second eyewitness "looked at the screen shot of page ten and said 'there you go right there.' " [8] The second eyewitness put his finger on the picture of Mr. Adams, the very same man the first witness had just identified, stating that he was "[a]bsolutely positive" that Mr. Adams was the shooter. Detective Sullivan was confident that neither witness had an opportunity to speak with the other during or between the photographic displays. The witnesses also recognized pictures of the black Nissan automobile that Mr. Adams drove on the night of the shooting.

After considering, and crediting, Detective Sullivan's testimony, the trial court denied Mr. Adams' motion to suppress. The trial court found that the photo display "was utterly unsuggestive" given that both eyewitnesses had "prior knowledge" of the shooter and that "until the first witness made the ID the police didn't even know who they were looking for." It concluded that "there was certainly nothing unduly suggestive about the way the police did [the display] and there's nothing about the procedure to question the reliability of the identifications."

On November 13, 2002, a jury trial was held in the Superior Court. The government presented the testimony of Bernard Brooks, Eugene Thomas, Marquette Brooks, and Donnell Diggins, each of whom identified Mr. Adams as the shooter, as well as Richard Griffin, Gregory Sullivan, and Christopher MacWilliams of the Metropolitan Police Department. The government presented no physical evidence linking Mr. Adams to the shooting.[9] Mr. Adams' defense at trial was misidentification; he testified in his own defense. On November 18, 2002, the jury found Mr. Adams guilty on all counts, except for first-degree murder while armed, instead convicting him of the lesser-included offense of second-degree murder while armed. Mr. Adams filed a timely notice of appeal.

### ANALYSIS

*The Motion to Suppress*

■ Mr. Adams' first contention is that the trial court erred when it denied his motion to suppress the two out-of-court identifications. He argues that the photo display was "unnecessarily suggestive" because Detective Sullivan failed "to make the pictures [in the line-up] resemble one another," and that his "very distinctive" facial features made him an "obvious" choice. Mr. Adams also argues that the identification made by the second witness "is questionable" because this witness was never given an opportunity to view the line-up generated by the District's database, and that in the second line-up, generated by Maryland's database, the witness was shown only six photographs.

---

**8.** All of the men included in page ten of the display were "black males" and were "wearing orange jumpsuits."

**9.** Mr. Adams moved for a judgment of acquittal at the close of the government's evidence. This motion was denied by the trial court. Mr. Adams failed to renew the motion.

We generally review the suggestiveness of an identification procedure "under a two part inquiry," *see Lyons v. United States,* 833 A.2d 481, 486 (D.C.2003) (citing *Turner v. United States,* 622 A.2d 667, 672 (D.C.1993)), to determine, first, whether the procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification," and second, "whether the identification is nonetheless sufficiently reliable," *see id.* However, we do not apply this two-part test in a situation, like the present, where there is no possibility of police suggestion or witness misidentification. Here, both of the eyewitnesses who identified his picture knew Mr. Adams for several years prior to the shooting. Not only did they know his name, but they were able to provide very detailed descriptions of his physical appearance which were virtually identical to each other. Detectives Sullivan and MacWilliams, who conducted the photo array, did not know who Mr. Adams was prior to the two eyewitnesses' identification; there was no evidence implicating Mr. Adams in the shooting prior to that point.

In *Green v. United States,* 580 A.2d 1325 (D.C.1990), we explained that "the likelihood of undue suggestivity is present only in situations where the perpetrator of the crime is a stranger to the witness and the latter is asked to make identification on the basis of a single photograph or by confrontation with a suspect in handcuffs or in a holding cell." *Id.* at 1327. Here, because one eyewitness had known Mr. Adams for "five or six years" prior to the shooting, and the other for "a couple of years," and because each was able to give a very detailed description of the man they saw shoot Mr. Thomas, there was not a "substantial likelihood of misidentification." *Turner, supra,* 622 A.2d at 672. Nor was there anything suggestive about either the computerized database shown to

the first eyewitness, or the photo database shown to both eyewitnesses; that is, nothing in either display made Mr. Adams "stand[ ] out dramatically." *Henderson v. United States,* 527 A.2d 1262, 1268 (D.C. 1987). Consequently, there was no error in the trial court's denial of the motion to suppress.

*The Cross–Examination Issue*

Mr. Adams' second contention is that the trial court erred when it limited his cross-examination of two key government witnesses, Bernard Brooks and Marquette Brooks. He argues that he was denied a "fair trial" because he was not permitted "to elicit testimony concerning contemporaneous drug use by any of the four Government eyewitnesses."

While "[i]t is axiomatic that the Sixth Amendment guarantees to a defendant in a criminal prosecution the right to be confronted with the witnesses against him," and that this guarantee includes "the opportunity to cross-examine government witnesses," this right is not without reasonable limitation. *Springer v. United States,* 388 A.2d 846, 854 (D.C.1978) (quoting *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)) (quotation marks omitted). The "extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court," and the trial court "may always limit cross-examination to preclude repetitive and unduly harassing interrogations ... or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial." *Springer,* 388 A.2d at 854–55 (citations and quotations omitted).

"When reviewing a trial court's decision to limit a defendant's cross-examination, 'the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial

court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial.'" *Flores v. United States,* 698 A.2d 474, 479 (D.C.1997) (quoting *Springer, supra,* 388 A.2d at 856). "This court first determines whether the trial court's decision violated the defendant's Sixth Amendment right to confront the witnesses against him by precluding a 'meaningful' degree of cross-examination."[10] *Id.* (citing *Jenkins v. United States,* 617 A.2d 529, 532–33 (D.C.1992)). "Where the trial court erred in limiting cross-examination, but the error is not of constitutional dimension, reversal will only be required if we conclude, upon consideration of the totality of the circumstances, that the error caused significant prejudice." *Flores,* 698 A.2d at 479 (citing *(James) Johnson v. United States,* 398 A.2d 354, 366 (D.C.1979)); *Springer, supra,* 388 A.2d at 856.

■ The record in this case reveals that during its cross-examination, the defense questioned Bernard Brooks on his drug use on the night of the incident. Bernard Brooks acknowledged that he smoked PCP at 8:00 p.m., but on redirect examination, explained that it was "out of his system" around "four a.m." Defense counsel also asked him whether he had seen "any other individuals [he was] with using drugs that night." The trial court sustained the government's objection to this question, and Bernard Brooks did not

answer it. A similar exchange took place during defense counsel's cross-examination of Marquette Brooks:

> Defense Counsel: At any time that night did you use any alcohol or drugs that might have affected your ability to observe things or think clearly?
>
> Marquette Brooks: No, sir.
>
> Defense Counsel: Okay. Did anybody you were with do that?
>
> Government: Objection.

The trial court again sustained the government's objection to this question. Based on the record before us, we are unable to discern the government's specific objection to the line of questioning, or the trial court's reason for sustaining the objection, but the question exceeded the scope of the direct examination. Although the trial court did not articulate this basis for its ruling, we "may affirm a decision for reasons other than those given by the trial court." *Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986) (citations omitted)

■ Furthermore, assuming, without deciding, that the trial court erred in limiting Mr. Adams' cross-examination of Bernard Brooks and Marquette Brooks regarding the drug use of others, we conclude that the error was harmless, *Flores, supra.* Mr. Adams was given the opportunity to question all four eyewitnesses on their own drug use on the night in question, and whether they were "under the influence" of "any alcohol or drugs that might have affected [their] ability to observe things or think clearly." Bernard

---

10. Where the trial court precluded a "meaningful" degree of cross-examination, and a proper objection was lodged, we "review the trial court's action under the harmless constitutional error standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." *Flores, supra,* 698 A.2d at 479 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (other citations omitted). To be considered

harmless, "[u]nder *Chapman,* it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony." *Jenkins,* 617 A.2d at 533 (quoting *Scull v. United States,* 564 A.2d 1161, 1166 (D.C.1989)) (other citation and quotation marks omitted).

Brooks indicated on cross-examination that he smoked PCP around eight o'clock the night before the incident, but on redirect examination, explained that it was "out of his system" around "four a.m." Marquette Brooks denied using any alcohol or drugs that might have affected his "ability to observe things or think clearly." Donnell Diggins, meanwhile, admitted that he drank several beers earlier in the evening and that he had been "intoxicated." Defense counsel did not attempt to cross-examine Eugene Thomas on his drug use. Nor did Mr. Adams attempt to call any of these witnesses in the defense case, when he could have asked about the drug use of the others in direct examination, or, at a minimum, clarified the basis for the trial court's earlier exclusion of the question during cross-examination of these witnesses during the government's case.

In short, Mr. Adams' contention that the trial court prevented him from "elicit[ing] testimony concerning contemporaneous drug use by any of the four Government eyewitnesses" is contradicted by the record, and he was not deprived of "a 'meaningful' degree of cross-examination," *see Flores*, 698 A.2d at 479. Moreover, when considered in the "totality of the circumstances," the trial court's limitation of cross-examination did not cause "significant prejudice" to Mr. Adams, *Flores, supra*, because Mr. Adams was able to ask each witness whether he was under the influence of any drugs at the time of the incident. In addition, the defense theory at trial was that the four eyewitnesses, all of whom disliked Mr. Adams, identified him as the shooter to "set him up." Whether they were under the influence of any drugs, however, would not have fur-

thered this theory. Any error was therefore harmless. *See Flores*, 698 A.2d at 479; *Springer*, 388 A.2d at 856.

*The "Same Gun" Issue*

■■■■■ Mr. Adams' third contention is that the trial court erred when it allowed Donnell Diggins to testify that he had observed Mr. Adams carrying the "same gun" that was used to shoot Mr. Thomas, a ".38 long nose," approximately two years before the shooting.[11] He argues that this testimony "was too remote in time" to be relevant, and that it "served no purpose but to inflame and confuse the jury." We review this claim for plain error. *See Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) ("[E]rrors not objected to at trial are unreachable on review unless they fall within the purview of the plain error rule."). "Plain error review permits us to grant a remedy where (1) there is error, (2) the error is plain, meaning 'clear' or 'obvious,' and (3) the error affected substantial rights." *Baker v. United States*, 867 A.2d 988, 1003 (D.C.2005) (citing *United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). On this record, we conclude that the trial court did not plainly err in failing to *sua sponte* limit the government's direct examination of Donnell Diggins.

In substance, Donnell Diggins testified that he observed Mr. Adams carrying the "same weapon" that was used to shoot Mr. Thomas two years before the shooting occurred. Through this testimony, the government sought to establish not only that Mr. Adams possessed the instrumentality used in the shooting, but to explain how Donnell Diggins was able to identify the weapon from such a great distance.[12] This

11. Donnell Diggins testified that during this earlier incident, which took place in January of 2000, "Michael Thomas shot at Glenn Adams." Defense counsel did not object to this testimony.

12. Defense counsel did not ask for a limiting instruction on this point.

court has previously held, however, "that 'an accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible.' " *McConnaughey v. United States*, 804 A.2d 334, 339 (D.C.2002) (quoting *Coleman v. United States*, 379 A.2d 710, 712 (D.C. 1977)). While "[i]t is true that [Donnell Diggins' testimony] established only a reasonable probability, and not a certainty, that [Mr. Adams] possessed the murder weapon, ... this lack of certainty [goes] only to the weight of the evidence, not its admissibility." *Id.* at 339. Therefore, we conclude that the trial court did not plainly err in admitting the challenged testimony.[13] *See Burgess v. United States*, 786 A.2d 561, 576 (D.C.2001).

*The Sufficiency of the Evidence*

 Mr. Adams' final contention is that the trial court erred when it denied his motion for judgment of acquittal "because there was insufficient evidence on which a reasonable jury could determine

guilt beyond a reasonable doubt."[14] He argues that "the physical evidence" of the shooting presented by the government "was in direct contradiction" with the eyewitness testimony.[15] "This court reviews the sufficiency of evidence under the same standard as the trial court—in the light most favorable to the government, 'giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact ....' " *Lyons v. United States*, 833 A.2d 481, 487 (D.C.2003) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987)). "The conviction will be overturned only where there has been no evidence produced from which guilt may reasonably be inferred."[16] *Lewis v. United States*, 767 A.2d 219, 222 (D.C.2001) (citation omitted).

 The crucial issue at trial was identification; to establish this, the government presented the eyewitness testimony of Bernard Brooks, Eugene Thomas, Marquette Brooks, and Donnell Diggins. All

---

13. We also note that "the evidence of [Mr. Adams'] prior possession of the gun was sufficiently linked to both [Mr. Adams] and the crime charged." *McConnaughey, supra*, 804 A.2d at 338. Donnell Diggins testified that he saw Mr. Adams twice with the ".38 long nose" gun, and Marquette Brooks testified that the gun used to shoot the decedent was a .38 revolver. The two years that separated the first sighting from the day of the shooting do not obscure this link.

14. Mr. Adams' failure to renew his motion for judgment of acquittal at the close of the evidence may bar him from raising the claim on appeal. *See Turney v. United States*, 626 A.2d 872, 873 (D.C.1993) (comparing *Noaks v. United States*, 486 A.2d 1177, 1178–79 (D.C. 1985) with *Washington v. United States*, 475 A.2d 1127, 1128–29 (D.C.1984)). As we noted in *Turney, supra*, "this court's decisions on this procedural point are not in harmony." 626 A.2d at 873. Nonetheless, this disharmony "need not be resolved here because even if appellant had renewed his motion, his claim would still fail." *Id.*

15. Specifically, he notes that while "[a]ll the eyewitnesses testified that [Mr. Adams] shot the decedent while standing face to face with him at point blank range ... the medical examiner ... testified that there was no evidence of stipling to indicate that the decedent was shot at close range, and that the bullet path was not consistent with the scenario in which a person is standing face to face with another and pointing a gun directly at them."

16. Additionally, "[i]n evaluating eyewitness identification testimony, we look to such factors as the ability of the witness to make a meaningful identification—the witness' opportunity to observe and the length of time of the observations, the lighting conditions, the length of time between the observations and the identification, the stimuli operating on the witness at the time of the observation, as well as the degree of certainty expressed by the witness in making the identification." *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988) (citation omitted).

four men, each of whom had known Mr. Adams for several years and described the attack in nearly identical fashion, made an in-court identification of Mr. Adams as the shooter. All four witnesses testified that they had an opportunity to see Mr. Adams moments before the shooting when he asked each of them where the decedent was; that they watched Mr. Adams shoot Mr. Thomas at close range; and that they had an opportunity to see Mr. Adams moments after the shooting when he drove his black Nissan automobile to where they were standing and stopped the car to yell something at them. Moreover, Marquette Brooks and Donnell Diggins both testified that Mr. Adams shot the decedent with a .38 revolver, the same weapon which he had been seen carrying prior to the incident. Viewing this testimony "in the light most favorable to the prosecution," we cannot say that "there has been no evidence produced from which guilt may reasonably be inferred." [17] *Lewis, supra,* 767 A.2d at 222.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

**17.** Mr. Adams' contention that the testimony provided by these four eyewitnesses is contradicted by "the physical evidence" of the shooting finds no support in the record. Contrary to Mr. Adams' assertion, the eyewitnesses did not "all" testify "that [Mr. Adams] shot the decedent while standing face to face with him at point blank range." First, Bernard Brooks testified that Mr. Adams was "three to four feet" from Mr. Thomas at the time of the shooting. This distance would explain the failure of the police to detect gun powder residue on the decedent. Second, Bernard Brooks testified that Mr. Adams and Mr. Thomas were not standing face to face; rather, Mr. Thomas was leaning to his left, with his hands in the air. This testimony is consistent with the evidence that the bullet entered the decedent's left arm. In any event, "inconsistent or contradictory [evidence] is not enough to reverse [his] conviction, as such considerations are best left to the jury for determining credibility." *Graham v. United States,* 746 A.2d 289, 297 (D.C.2000). *See also Gibson v. United States,* 792 A.2d 1059, 1066 (D.C.2002) ("We have ... made clear on many occasions that inconsistencies in the evidence affect only its weight, not its sufficiency, and are in any event for the jury to resolve.") (citing *Dickerson v. United States,* 650 A.2d 680, 683 (D.C.1994); *Hill v. United States,* 541 A.2d 1285, 1287 (D.C.1988); *Payne v. United States,* 516 A.2d 484, 495 (D.C.1986)).