**UNITED STATES, Appellant,**

v.

**Thomas HUNTER, Appellee.**

No. 96–CO–756.

District of Columbia Court of Appeals.

Argued Feb. 25, 1997.

Decided April 24, 1997.

Gregg A. Maisel, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and Amy J. Conway, Assistant United States Attorneys, were on the brief, for appellant.

John Thomas Kenney, Syracuse, NY, appointed by the court, for appellee.

Before FERREN, STEADMAN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

The United States appeals from an order granting Thomas Hunter's motion to suppress the eyewitness identification of him by Richard Jones and William Juame, who were the two victims of a robbery. The government contends that the trial judge applied an erroneous legal standard to the evidence of record. We agree and reverse.

## I.

### THE EVIDENCE

A grand jury indicted Hunter on one count of robbery and one count of attempted robbery. See D.C.Code §§ 22–2901, –2902 (1996). The United States proposed to introduce at trial testimony that both of the complaining witnesses identified Hunter at a showup a few minutes after the robbery. The prosecutor also intended to elicit from Juame an in-court identification of Hunter. Hunter filed a pretrial motion to suppress all of these identifications.

The testimony at the hearing on that motion [1] revealed that on September 28, 1995, at approximately 6:30 p.m., Jones, a student at Howard University, was driving his car near the intersection of Seventh and P Streets in northwest Washington, D.C. His friend Juame, a bank teller, was riding in the passenger seat. The two men were on their way to get a bite to eat. Jones pulled over to the side of the road to retrieve an object which had slipped under the seat.

Before Jones and Juame could resume their journey, four young men, all strangers to the complainants, approached the now-stationary vehicle. One of the men, to whom we refer as Robber No. 1, stood outside the door on the passenger's side. A second man, hereinafter Robber No. 2, positioned himself on the driver's side. Jones and Juame were thus trapped inside the vehicle as they nervously awaited further developments.

Following some inconsequential conversation, Robber No. 2 reached into the vehicle and attempted to take the keys out of the ignition. When Jones sought to hold on to the keys, Robber No. 1 pressed a hard object against Juame's head and demanded money. Juame denied that he had any money. Robber No. 1 patted Juame down, and he then opened the right rear door of the car and extracted a white hooded windbreaker jacket belonging to Jones. In the meantime, Robber No. 2 took from Jones a wallet containing approximately $100. The complainants told their unwelcome visitors that there were police officers in the parking lot of a nearby Giant Food supermarket, and the robbers then fled with their loot.

Having succeeded in retaining possession of his ignition key, Jones immediately drove into the supermarket's parking lot. He and Juame reported the robbery to an off-duty police officer who was moonlighting as a security guard. The two men provided the officer with descriptions of two of the robbers. Juame told him that Robber No. 1— the man who had stood outside the front passenger door of the car—was a young black man with braids, and that he was wearing jeans and a white t-shirt with an "eight-ball, sort of like in the center of his shirt."

Based on the information provided by Jones and Juame, the officer immediately broadcast descriptions of two of the robbers. A few minutes later, one of the officers who had responded to the lookout sighted a man apparently fitting the description of Robber No. 1 in an alley half a block from the supermarket. The suspect attempted to elude the pursuing officers but, following a brief chase, he was apprehended. When taken into custody, the fleeing man was wearing a white t-shirt. The front of the shirt was

---

1. Four police officers and the two victims of the robbery testified for the prosecution at the motions hearing. The defense called no witnesses. The testimony was quite extensive, and we summarize in this opinion only those parts of it which we perceive to be relevant to the question whether the victims' eyewitness testimony was properly suppressed.

Aside from the imperfect description by Jones and Juame of the emblem on Hunter's t-shirt— an issue which is discussed in some detail below—Hunter also points to certain other alleged discrepancies and weaknesses in the testimony adduced by the government. In our view, however, none of these asserted discrepancies or weaknesses even arguably supports the extreme remedy of suppression.

adorned with a design containing the letter "B" inside a circle, followed by the letters "o-s-s" in smaller print. A police detective testified that, at least at first glance, the "B" looked like an "8". The man who was wearing this t-shirt was Thomas Hunter.

The officers soon apprised Jones and Juame that two suspects had been taken into custody and that they would be displayed to the complainants at "like a driveby" to determine if Jones or Juame could recognize either of them. The officers transported Jones and Juame together in a police cruiser to the intersection of Seventh and Q Streets, N.W., where the two suspects were being detained. The first suspect was displayed to the two victims, but both men stated that he was not one of the robbers; indeed, neither Juame nor Jones had ever seen him before. When the second suspect was displayed, however, Juame promptly identified him as Robber No. 1. Jones did the same a few seconds later.

The identifications of Hunter were effected in daylight, approximately ten minutes after the robbery, and within a block of the location where the crime occurred. Juame stated that he had recognized Hunter as the police cruiser was arriving on the scene, before Hunter was formally displayed to the victims. Juame testified that he was a "hundred percent" certain that Hunter was Robber No. 1. He was positive about his identification because Hunter still "had on this white t-shirt with this eight-ball on it" and because Juame "noticed his face and his hair, things like that."

Jones also told the police that Hunter was Robber No. 1. According to Jones, the second man displayed to him at the driveby "looked like the same person [as Robber No. 1], the same slender build, same complexion, same shirt." Jones described that shirt as "the white shirt with the eight-ball on it." Jones was asked whether the man whom he identified at the showup differed in any respect from Robber No. 1, and he responded with a simple "no."

Jones testified that before he made his identification of Hunter, the officers returned his stolen jacket to him. Jones was informed that the jacket had been found in an alley.

Jones had also heard over the police radio that officers were chasing someone, and he knew that they had stopped a suspect in an alley. Jones did not know, however, which of the two suspects had been in the alley. Jones also testified that he did not believe that his identification of Hunter as Robber No. 1 was swayed by Juame's identification a few seconds earlier.

## II.

## THE TRIAL JUDGE'S RULING

At the hearing on Hunter's motion to suppress, the prosecutor initially intended to rest after having established, through the testimony of two police witnesses, that the complainants had identified Hunter under the circumstances described above. The judge commented, however, that "it becomes very problematical for the court to make a ruling when the evidence is as sketchy as this evidence has been." In light of the judge's reaction, the prosecutor called two additional police witnesses, and she completed her case with the testimony of Jones and Juame.

After the parties rested, the judge conducted a lengthy colloquy with the attorneys in which she explained her view of the evidence and of the applicable legal principles. The judge found that the circumstances of Juame's identification of Hunter were "no more suggestive than any other on-the-scene identification that typically happens soon after an incident." The prosecutor argued that this finding required the judge to deny the motion to suppress Juame's identification, but the judge thought that this was wrong:

> It seems to me even without undue suggestivity in the one-on-one show-up we know from the Court of Appeals that there is inherent suggestivity in that process, but it will be permitted to be admitted in evidence if the court is satisfied that there are sufficient indicia of reliability to avoid irreparable risk of misidentification.
>
> I'm not sure we have got those indicia of reliability here.

The judge's prime concern appeared to relate to the perceived discrepancy between the complainants' testimony that Robber No.

1 was wearing a t-shirt with an eight-ball and the police testimony that the emblem was actually a large "B" followed by "o-s-s" in small letters:

> My concern is that the man closest to that t-shirt, who had the best opportunity to see what was on it, and the guy with the second best opportunity to see what was on it ...—Mr. Juame and Mr. Jones— are both unshakable in saying that it was an eight-ball. And just as unshakable in his description of what the Defendant was wearing is Officer Hambrick but also Detective Johnson in stating that was no eight-ball on Mr. Hunter's shirt.

The judge rejected as inconclusive the positive character of Juame's identification of Hunter; she said that "certainty all by itself is not enough." Pointing out that the complainants had both stated that the first suspect displayed to them was *not* one of the robbers, the prosecutor argued that this circumstance significantly rebutted Hunter's claim that the showup was unduly suggestive. The judge would have none of it:

> That proves nothing, it seems to me, it proves absolutely nothing.... The real test would be would he have been able to pick him out in a lineup without the eight-ball shirt on.

The judge then ruled that the testimony of Juame and Jones was not sufficiently reliable to permit either witness to testify to his identification on the scene or to identify Hunter in the courtroom. Noting the absence of an arrest photograph of Hunter,[2] the judge concluded that the prosecution had failed "to somehow explain why [Hunter] wasn't wearing an eight-ball t-shirt but the robber was." The judge stated that this was a "critical deficiency ... in the government's proof here today on the issue of the reliability of the identification." The judge also held as follows:

Certainly there was impermissible suggestivity in the on-the-scene ID by Mr. Jones. I mean he already heard the police radio that someone was being chased in an alley, somebody had been caught in an alley and his jacket was given to him as having been recovered in an alley before he was asked to look at Mr. Hunter.

And when I put all of that together I think the risk of irreparable misidentification is so great in this case that I am going to grant the motion to suppress all identification testimony.

■ The United States filed a timely notice of appeal pursuant to D.C.Code § 23–104(a)(1) (1996), which authorizes the prosecution to appeal from "an order, entered before the trial of a person charged with a criminal offense, which ... suppresses evidence, or otherwise denies the prosecution the use of evidence at trial."[3]

## III.

### HUNTER'S DUE PROCESS CLAIM

■ The judge's ruling on Hunter's motion appears to reflect a belief on her part that if she entertained concerns regarding actual or perceived discrepancies in the complaining witnesses' testimony, the appropriate remedy was to suppress the evidence and thus to preclude the jury from hearing it. We do not agree with this approach. On the contrary, except in a very narrow class of cases which differ in decisive respects from the present record, it is the function of the jury to determine whether eyewitness identification is reliable. *See, e.g., Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) ("evidence with some element of untrustworthiness is customary grist for the jury mill"); *Turner v. United States,* 622 A.2d 667, 673 (D.C.1993) (discrepancy between descriptions by witness and police officer of the suspect's pants was

---

2. It appears that the police attempted to photograph Hunter in the t-shirt, but the film came back "blank." The prosecutor requested leave to recall one of the police officers so that the officer could prepare a drawing of the emblem on the shirt, but the judge declined to reopen the record.

3. Following the suppression of the identification testimony, the judge granted the government's motion to dismiss the indictment. The government proposes to seek a new indictment, however, and the case is not moot. *See, e.g., United States v. Cefaratti,* 91 U.S.App. D.C. 297, 299, 202 F.2d 13, 14 (1952), *cert. denied,* 345 U.S. 907, 73 S.Ct. 646, 97 L.Ed. 1343 (1953).

for the jury to weigh). If, at trial, the judge is of the opinion that the identification testimony, together with all of the other evidence, is insufficient to permit an impartial jury to find guilt beyond a reasonable doubt, the judge may—indeed, he or she must—grant a motion for judgment of acquittal. *See, e.g., Beatty v. United States,* 544 A.2d 699, 701–03 (D.C.1988). In this case, however, we are dealing with admissibility, not with sufficiency, and suppression on due process grounds is warranted only where the circumstances of an identification were so unduly suggestive that there is a very substantial danger of irreparable misidentification. *See, e.g., Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967). There were no such circumstances in this case.

■ Both Juame and Jones identified Hunter at a showup about ten minutes after the robbery, a block or so from the spot where it took place. This court has repeatedly upheld the validity of showup procedures carried out, as in this case, soon after the commission of the crime and the apprehension of suspects. *See, e.g., Turner, supra,* 622 A.2d at 672–73; *Singletary v. United States,* 383 A.2d 1064, 1068 (D.C.1978); *Russell v. United States,* 133 U.S.App. D.C. 77, 81, 408 F.2d 1280, 1284, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). The admission of evidence of such identification is consistent with common sense and sound practice; a prompt showup enhances the reliability of an identification and may, as in this case, exonerate an inno-

cent person who has been mistakenly apprehended. *Russell, supra,* 133 U.S.App. D.C. at 81, 408 F.2d at 1284.

Although a degree of suggestibility is inevitable in the context of every pretrial confrontation between a witness and a suspect, a defendant is not denied due process of law unless ... in the totality of circumstances, the on-the-scene confrontation was *unnecessarily* suggestive and conducive to a substantial likelihood of irreparable misidentification.... In considering the totality of the circumstances, an immediate on-the-scene confrontation has uniquely powerful indicia of reliability which more than counterbalance any suggestivity, *absent special elements of unfairness....* Furthermore, something more egregious than mere custodial status is required in order to establish such special unfairness.

*Singletary, supra,* 383 A.2d at 1068 (citations omitted; emphasis added); *see also Turner, supra,* 622 A.2d at 672.

■ In the present case, there was no undue suggestivity. The trial judge expressly so found with respect to Juame, and Hunter has not challenged that determination. We conclude that there was likewise no undue suggestivity as to Jones.[4]

■ As the government correctly argued in the trial court and reiterated in this court, the absence of any showing of undue suggestivity is dispositive of Hunter's due process claim. In *Greenwood v. United States,* 659 A.2d 825 (D.C.), *cert. denied,* —— U.S. ——, 116 S.Ct. 326, 133 L.Ed.2d 227 (1995), this court summarized the appropriate judicial

4. It is true, as the judge indicated, that Jones' coat had been returned to him prior to his identification of Hunter, and that Jones was aware that a suspect had been captured in the alley where the coat was found. Jones had no idea, however, which of the two suspects had been apprehended in that alley, and he promptly exonerated the first man whom the officers displayed to him. *See, e.g., United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir.), *cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992) (witness' selective identification of two robbers, while failing to identify a third man, supported the conclusion that the identification procedures comported with due process). In any event, any witness at an on-the-scene identification procedure carried

out a short time after a robbery surely knows, or at least surmises, that a person whom the police display to him is likely to be a suspect; Jones was told no more than that. *Cf. United States v. Jones,* 84 F.3d 1206, 1209–10 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996).

The fact that Jones was present when Juame identified Hunter goes to the weight of his testimony, but does not constitute undue suggestivity warranting suppression. *Harvey v. United States,* 395 A.2d 92, 96 n. 9 (D.C.1978), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979); *see also United States v. Wilson,* 140 U.S.App. D.C. 331, 333, 435 F.2d 403, 405 (1970).

inquiry where the admissibility of an eyewitness identification is at issue:

> First, the trial court must determine whether the procedures are so impermissibly suggestive that they give rise to a very substantial likelihood of irreparable misidentification. *Neil v. Biggers,* 409 U.S. 188, 196, 93 S.Ct. 375, 380–81, 34 L.Ed.2d 401 (1972); *see Stewart [v. United States],* 490 A.2d 619, 622 [ (D.C.1985) ]. *If the trial court finds undue suggestivity,* it must then determine whether the identification was nonetheless reliable. If the identification is reliable, it is admissible, as is evidence relating to the identification procedures that were found to be suggestive. *Neil,* 409 U.S. at 199, 93 S.Ct. at 382.
>
> *On the other hand, if the identification procedures are not unduly suggestive, the details of those procedures are admissible and no reliability finding is necessary.*

*Id.* at 828 (emphasis added).[5] We reiterated only a few months ago that "[n]o reliability determination is required unless the trial court has determined that the eyewitness identification was unduly suggestive." *Scales v. United States,* 687 A.2d 927, 937 n. 15 (D.C.1996); *see also Wilkerson v. United States,* 427 A.2d 923, 926 (D.C.1981), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981) (where a showup has not been shown to be unduly suggestive, the court need not evaluate its reliability).

■ In light of these authorities, we agree with the government that

> undue suggestivity is a necessary—but not sufficient—condition for any finding that an identification procedure violates the Due Process Clause.... [I]f a showup identification procedure has no special elements of unfairness beyond the suggestivity inherent in any showup, the procedure does not offend due process, regardless of the court's views concerning the reliability of the identification.

The trial judge's rationale for suppressing the identification testimony in this case cannot be reconciled with the controlling legal principles as we have summarized them. Accordingly, her order cannot be sustained.

## IV.

### THE EVIDENTIARY ISSUE

■ Hunter contends that even if his due process claim fails, the identifications of him by Juame and Jones were inadmissible under the rules of evidence. Pointing to the discrepancy as to whether the insignia on his t-shirt was an eight-ball or a large "B" followed by "o-s-s" in small letters, he asserts that the evidence of the complaining witnesses was so unreliable that the jury should not be permitted to hear it. We discern no merit in this contention.

■ "Suppression of identification testimony because it is deemed too weak is not proper. That is the function of a timely judgment of acquittal." *Brown v. United States,* 349 A.2d 467, 468 (D.C.1975); *see also Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978) (quoting *Brown* ). The kinds of objections which Hunter has interposed to the eyewitness testimony in this case go to its weight, and not to its admissibility.

Hunter relies on *Sheffield v. United States,* 397 A.2d 963 (D.C.1979). In that case, the court affirmed the defendant's conviction and rejected a challenge to the prosecution's eyewitness identification testimony. In doing so, the court volunteered that even in the absence of a showing of undue suggestivity, "[a] defendant may challenge the admission of such testimony by raising a timely objection to its admissibility at trial on the ground that under the law of evidence testimony is so inherently weak or unreliable as to lack probative value." *Id.* at 967. The court did not specify under what circumstances identification testimony would be so devoid of probative value as to render it inadmissible even

---

5. We further explained that even though no finding as to reliability is required in the absence of a showing of undue suggestivity, we have encouraged trial judges to make such a finding "because, in that occasional case where we disagree with the no-suggestivity finding, or where that

finding presents a close question, the appeal can be resolved based on the outcome of the reliability determination without the need to remand for findings on that point." *Greenwood, supra,* 659 A.2d at 828.

in the absence of any showing of undue suggestivity. The court did, however, refer to our earlier decision in *Reavis*.

In that case, this court addressed the question whether eyewitness testimony was admissible under the law of evidence by resorting to conventional relevance analysis. The court explained that identification testimony, like any other evidence, is relevant if it has a tendency to establish the proposition sought to be proved, or "to make the existence or non-existence of a fact more or less probable than would be the case without that evidence." *Reavis, supra,* 395 A.2d at 78 (quoting *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977) (other citations omitted)). To be admissible, the proffered evidence, standing alone, need not be sufficient to go to the jury. *Id.*[6]

In the present case, the two complaining witnesses had the opportunity to observe Hunter for an appreciable period of time. They identified him within ten minutes after the robbery. Each man expressed certainty that police had the right man. Their identifications thus incontestably rendered the fact to be proved—that Hunter was Robber No. 1—more probable than it would have been without this evidence. *Reavis, supra,* 395 A.2d at 78.[7] There was therefore no basis in the law of evidence for excluding their testimony.[8]

### IV.

### CONCLUSION

■■■■ We have recognized, as have other courts, that eyewitness identification by strangers may often be fraught with peril. *See, e.g., Webster v. United States,* 623 A.2d 1198, 1204 n. 15 (D.C.1993). Even if a witness says that he is sure, "positive" can mean "mistaken at the top of one's voice." *Id.* (citations omitted); *see also Crawley v. United States,* 320 A.2d 309, 312 (D.C.1974). It is undoubtedly the trial judge's responsibility to be alert to any danger that the wrong man is in the dock.

■■■■ This responsibility does not, however, permit the judge to exclude probative evidence from the jury simply because the judge has doubts as to its reliability. We conclude that in this case, the judge, in her laudable attempt to assure fairness to the accused, treated a question of admissibility as though it were one of insufficiency. In doing so, in our view, the judge trespassed into the province of the jury; suppression here was incompatible with the court's duty "to limit the societal costs of a sanction that excludes relevant evidence from consideration and evaluation by the trier of fact." *Manson, supra,* 432 U.S. at 110, 97 S.Ct. at 2251.

For the foregoing reasons, the order of the trial court suppressing the identification testimony is

*Reversed.*

---

6. In this case, there was plainly enough evidence to withstand the motion for judgment of acquittal. Two witnesses positively identified Hunter minutes after the commission of the crime. "This court has repeatedly held that the identification testimony of a single eyewitness is sufficient to sustain a conviction." *In re R.H.M.,* 630 A.2d 705, 708 (D.C.1993) (citations omitted). If the evidence was sufficient to support Hunter's conviction, then, *a fortiori,* it must have been sufficiently probative to warrant its admission.

7. If the evidence were excluded at trial, the jury might well assume that because the complainants could not recognize Hunter as Robber No. 1 only minutes after the robbery, he must surely be the wrong man.

8. Hunter also relies on this court's decision in *Beatty, supra.* In that case, the "thought occur[red] to us" that even if a motion to suppress a pretrial identification on constitutional grounds is denied, the trial court may, upon an appropriate showing, rule that the pretrial identification is inadmissible under the rules of evidence. 544 A.2d at 703 n. 6. In *Beatty,* the question was whether the trial judge erred in denying a motion for judgment of acquittal where the one witness who had made a pretrial identification of the defendant was not asked to identify him at trial, and had cast serious doubt on the accuracy of his own pretrial identification. The court's discussion of suppression of an identification was not necessary for the disposition of the case, and it arose in this unusual factual context—a scenario entirely different from the present one.