Donte M. PERRY, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1338, 01–CO–256.

District of Columbia Court of Appeals.

Argued Jan. 10, 2002.

Decided Dec. 19, 2002.

Sydney J. Hoffmann, appointed by the court, for appellant.

Mary Patrice Brown, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Angela G. Schmidt, Carolyn K. Kolben, and Carla Diggs Smith, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, REID and GLICKMAN, Associate Judges.

STEADMAN, Associate J.:

Appellant was convicted by a jury of an aggravated armed assault with intent to rob Roland Ngong.[1] After the trial itself had begun, the government furnished appellant with Ngong's grand jury testimony, which appellant contends undermined the accuracy of Ngong's identification of appellant. The principal issue before us is whether the trial court erred when it denied without a hearing appellant's post-trial motion alleging that (1) the government violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to disclose Ngong's grand jury testimony in a more timely manner; and (2) trial counsel's failure to move for a mistrial or make a motion to suppress Ngong's allegedly impermissibly suggestive post-attack identification of appellant amounted to ineffective assistance of counsel.[2] We remand the case for further consideration of the ineffectiveness claim with respect to the failure to file a suppression motion..

## I. Facts

Around four o'clock in the morning of December 21, 1997, Roland Ngong was walking home when he was accosted by a person demanding money. The assailant was carrying something close to his chest, later identified as a shotgun. Although Ngong pulled fifty dollars from his pocket in an attempt to comply with his assailant's request, he felt that the assailant was becoming more aggravated. Ngong was

---

1. More specifically, appellant was convicted of the following offenses: Assault With Intent To Rob While Armed (D.C.Code §§ 22–503, –3202, –501); Aggravated Assault While Armed (D.C.Code § 22–504.1, –3202); Possession of a Firearm During the Commission of a Crime of Violence (D.C.Code § 22–3204); and Carrying a Dangerous Weapon (D.C.Code § 22–3204(a)). All cites are to the 1981 codification and supplements.

2. Appellant also argues that trial counsel failed to adequately utilize the *Brady* material in cross-examination of Ngong, contends that his post-trial motion should be considered as one based upon newly discovered evidence and challenges the sufficiency of the evidence to support the convictions. We reverse the conviction of aggravated assault for want of sufficient evidence.

scared he would be shot whether or not he gave the man his money. Therefore, he shoved the assailant's gun with his left hand. The gun fired and shot Ngong through the palm of his left hand, and sprayed pellets into his face. Ngong then ran away, followed by his assailant, who eventually turned off in a different direction. Ngong ran home and called 911 to request an ambulance. During the 911 call Ngong described his assailant as a black man with a dark complexion, approximately 16 to 20 years old, with no facial hair, wearing a blue or black jacket with the hood up, blue or black jeans, and carrying a blue bag.

Waiting for medical treatment at the hospital, Ngong happened to be seated outside a hospital room occupied by appellant, who had also come to the hospital with a gunshot wound. As Ngong testified at trial about noticing appellant: "I saw a gentleman who looked like the guy that robbed me. I just kept quiet since I didn't know what brought him out there. I didn't want to—I didn't want to be assessed as being stupid or something, acting stupid." [3]

While in the process of questioning Ngong at the hospital,[4] the investigating detective became aware of the fact that another individual, appellant, was being treated for a similar gunshot wound to the hand. The detective then interviewed appellant, who told him that a 6 foot to 6'1" man "wearing a darkcolored jacket and a hood with a sawed off shotgun, blue jeans, and black boots" approached and attempted to rob him. In the ensuing struggle, the shotgun went off and hit appellant in the hand. During this interview the detective became suspicious of appellant because the description both Ngong and appellant offered of their assailant matched the appearance of appellant and because appellant was evasive about where he was prior to and at the time of the shooting as well as how he had been shot.

The detective picked up a dark jacket on the floor of appellant's room, took it to Ngong, and, according to Ngong, asked if it looked like his assailant's jacket. Ngong responded in the affirmative [5]. Ngong testified that some police officer also brought in a pair of boots and asked if they looked like the assailant's boots. Ngong again responded in the affirmative.[6] Then the detective asked Ngong to look through the window separating his own room from the treatment room next to his and see if the "guy in the room next door is the guy" who had robbed him. Without hesitation, Ngong positively identified the appellant as the person who had robbed him.[7] Appellant was then placed under arrest.

---

**3.** Before the grand jury, Ngong testified with respect to this encounter, "[w]hen I got to the emergency room I saw someone lying in the bed. It looked like the guy that had just attacked me, but I was likeI just kept quiet to myself. I didn't want to—because it might have been *somebody else that was that got into an altercation and is there foris there for some other reason.*"

**4.** Although the questioning included obtaining from Ngong a description of his assailant, Ngong apparently never told the detective that *he had seen his assailant at the hospital* until the eventual show-up identification.

**5.** "It looked exactly almost like the jacket, but the only difference was I thought it was blue, that I can't believe the other color clearly though." The detective testified that he held up the jacket and asked whether Ngong had seen the jacket before and that Ngong had responded: "that's the jacket the guy was wearing that shot me."

**6.** The detective in testifying made no mention of any boots having been shown to Ngong.

**7.** Ngong said: "I knew it was the guy, because I had a pretty close look at him, and plus the fact that I remember when I, when I had seen his face the first time, he squint at

At trial, consistent with what his counsel had already set forth in opening statement, appellant testified that he and Ngong had an encounter, but claimed that he was the victim and Ngong was the assailant. He testified that while en route to his girlfriend's house he was confronted by a dark skinned man between 5'6" and 5'9" that looked like Ngong, whom he identified in court. This man repeatedly asked him for money and carried an unzipped duffle bag from which an inch or two of a gun barrel protruded. After a struggle in which appellant put his hand inside the duffle bag, appellant claims he accidentally fired the gun, shooting himself in the hand.[8] From there he went directly to the hospital, arriving before Ngong.

## II. Brady Violation

■■■ Appellant first argues that he is entitled to a new trial because the government violated the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to provide the defense with Ngong's grand jury testimony during pre-trial discovery.[9] Appellant asserts that the grand jury testimony constituted *Brady* material because it demonstrated that (1) Ngong did not initially identify with certainty the appellant during their chance encounter at the hospital (see note 3, *supra*) and (2) the police-sponsored show up was suggestive and unreliable.[10] From this premise, appellant contends that he did not receive the *Brady* material "in time to use it effectively at trial." *Edelen v. United States*, 627 A.2d 968, 971 (D.C.1993).

■■■ While Ngong's grand jury testimony essentially tracked his trial testimony, appellant argues in essence that this *Brady* material came too late because he had already made his opening statement. He asserts that he would have presented his defense in a different light, both by way of his defensive position, see note 12, *infra*, and by a pretrial suppression motion, had he been previously apprised of the grand jury testimony. However, the information clearly came in time for appellant to have moved during the trial itself for a mistrial on this basis or to suppress the identification, which he did not do. *Cf. United States v. Wilson*, 333 U.S.App. D.C. 103, 112, 160 F.3d 732, 741 (1998) (no *Brady* plain error where counsel failed to request a continuance or move for a mistrial and instead made effective use of the statements at trial), *cert. denied*, 528 U.S. 828,

---

me, and that was the squint that he did again." When asked how sure he was that that was the man that robbed him, Ngong answered: "I was very sure." Ngong did not make any in-court identification of appellant.

8. Appellant acknowledged that he did not mention to the police at the time of their interview at the hospital that he had accidentally fired the gun himself, explaining that he did not think it was relevant.

9. Although the timing is not absolutely clear from the record, it appears that Ngong's grand jury testimony was turned over to appellant's counsel at the time of Ngong's direct examination. Appellant's alternative contention that his motion should have been considered as one based upon newly discovered

evidence has no merit. Evidence known to the appellant during trial can not be considered newly discovered. *See Quick v. United States*, 316 A.2d 875, 876 (D.C.1974) (citations omitted); *United States v. Calderon*, 127 F.3d 1314, 1352 (11th Cir.1997) (rejecting claim that facts known to appellant were "newly discovered" because "he did not appreciate the legal significance of what he claims he witnessed"), *cert. denied*, 523 U.S. 1033, 118 S.Ct. 1328, 140 L.Ed.2d 490 (1998).

10. We will assume for present purposes that this information fell within the *Brady* doctrine. The government is expected to "resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

120 S.Ct. 81, 145 L.Ed.2d 69 (1999); *State v. Bryant*, 17 Conn.App. 525, 554 A.2d 1105, 1108 (1989) (no *Brady* violation when defense counsel had the ability to request a continuance or recess and failed to do so). Thus, the *Brady* claim is effectively subsumed within appellant's closely related ineffectiveness claim, to which we now turn.[11]

### III. Effectiveness of Trial Counsel

Appellant's second claim is that, after revelation of the possible identification defects raised by Ngong's grand jury and trial testimony, his trial counsel's failure to move for a mistrial or at a minimum make a motion to suppress the allegedly impermissibly suggestive identification amounted to ineffective assistance of counsel. This court reviews ineffective assistance of counsel claims in light of the familiar two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In our view, the key determinant in this case [12] is whether trial counsel competently concluded, as his post-trial affidavit averred, that he did not see any likelihood of success in moving to suppress Ngong's identification.

To prevail on a motion to suppress an identification on due process grounds, a defendant must show that the law enforcement procedures used were impermissibly suggestive and that there was not an independent basis to insure the reliability of the identification. *See, e.g., Maddox v. United States*, 745 A.2d 284, 292 (D.C. 2000) (citation omitted); *United States v. Hunter*, 692 A.2d 1370, 1374–75 (D.C. 1997). As the facts set forth above indicate, elements of suggestivity may exist in the scenario here (including some testimonial conflict, see, e.g., notes 5 & 6, *supra*) as well as elements of unreliability.[13] Because of the defense strategy in the case to present Ngong as the aggressor and defendant as the victim, identification was not a real issue at the trial and the questioning did not particularly focus on the hospital identification procedure or any weaknesses therein.[14] With respect to appellant's post-trial motion, while appellant utilized the facts developed at trial to argue undue suggestivity and unreliability, the trial court thought it unnecessary to address the issue in disposing of the motion without a hearing.[15]

11. Speaking for himself alone, the author harbors some doubt that the *Brady* doctrine can be invoked in the face of a defendant's own sworn version of the facts or that trial counsel can be constitutionally faulted for acting in accordance therewith. However, these issues can await another day.

12. Appellant asserts that if he had received the grand jury testimony before making his opening statement, he could have argued that he himself was attacked in a similar but different incident in the same vicinity at around the same time or simply have put the government to its proof, especially on the issue of identification. However, we do not think that there is a reasonable probability that either of these strategies would have changed the outcome of the trial, as required both by *Brady* and by *Strickland*. We are of the same view with respect to appellant's complaints about the quality of his trial counsel's cross-exami-

nation of Ngong. Everything seems to turn on the suppression issue.

13. Appellant points, for example, to the manner in which the police showed the jacket and then the boots to Ngong before inviting him to view appellant. He also points to the apparent tentativeness of Ngong's initial identification upon first arriving at the hospital and Ngong's apparent failure to give any indication to the detective questioning him about the details of the offense, including the physical appearance of the assailant, that he had just seen the assailant in the next room.

14. As previously stated, see note 7, *supra*, Ngong made no in-court identification.

15. The trial court in denying the motion did not reach the suppression issue because of its view that appellant could not have successful-

■ Thus, we are presented with a situation where there has been no trial court consideration of the suppression issue, and we are reluctant to undertake that examination here for the first time on appeal. We are of the view that a prudent course of action in the circumstances here is to remand the case to the trial court to afford an opportunity for an initial airing of the suppression issue at the trial level. We emphasize that in doing so, we intend to intimate no views whatsoever with respect to any aspects of the merits of the suppression issue and the related claim of ineffectiveness or to the appropriate procedures that the trial court may deem to follow on remand.

## IV. Evidentiary Sufficiency

■ Appellant's remaining claims relate to claimed insufficiency of the evidence. We apply the long-established and oft-repeated standard, reviewing the evidence "in the light most favorable to the government, giving full play to the right of the [fact finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Guishard v. United States,* 669 A.2d 1306, 1312 (D.C.1995) (citing *Curry v. United States,* 520 A.2d 255, 263 (D.C. 1987)).[16] We will not reverse unless there

is no evidence from which a "reasonable mind might fairly conclude guilt beyond a reasonable doubt." *In re L.A.V.,* 578 A.2d 708, 710 (D.C.1990) (quotation omitted).

■ With respect to the charge of assault with intent to commit robbery, appellant challenges the sufficiency of proof of intent to rob. He bases this argument on the fact that when Ngong held out the money, appellant did not immediately take it but kept on speaking. This fact is hardly conclusive in light of the prior demand of appellant: "Do you think I'm fucking joking? Empty your pockets." Appellant also contests the reliability of his identification by Ngong.[17] "Convictions can be sustained on the basis of the testimony of a single eyewitness." *Garris v. United States,* 559 A.2d 323, 329 n. 4 (D.C.1989) (citations omitted). Here, Ngong's account did not stand alone but was corroborated by medical evidence[18] and appellant's evasive police interview. "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *United States v. Bamiduro,* 718 A.2d 547, 551 (D.C.1998) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). "[C]ases in which reversals are required because the identification evidence was insufficient are 'very rare'.... This is not one of those rare

ly mounted a misidentification defense in light of appellant's statement to the detective at the hospital. We think this underestimates the potential weaknesses in the government's case absent the show-up identification by Ngong.

16. Appellant asserts, citing Super. Ct.Crim. R. 29(b), that since the trial court simply took under advisement his motion for judgment of acquittal at the end of the government's case, our review should be similarly limited. Even under this approach, the evidence was sufficient.

17. It may be that, quite apart from due process considerations, it is theoretically possible for an identification to be so inherently weak or unreliable as to lack probative value and hence be inadmissible under the rules of evidence. Almost invariably, however, weaknesses in eyewitness testimony go to weight, not admissibility. *United States v. Hunter, supra,* 692 A.2d at 1376–77.

18. The treating physician explained that the pellets had entered appellant's hand from the back of the hand rather than from the palm side of the hand, which was consistent with Ngong's version of events.

cases." *Gethers v. United States,* 684 A.2d 1266, 1275 (D.C.) (quotation omitted), *cert. denied,* 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997). The same is true here.[19]

 With respect to appellant's conviction for aggravated assault while armed, a person commits that offense if "(1) [b]y any means, that person knowingly or purposely causes serious bodily injury to another person, or (2)[u]nder circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury." D.C.Code § 22–504.1. Although the trial court gave an instruction to the jury covering both means by which this offense may be committed, the indictment did not include the second prong, the possibility of conviction on that basis was not addressed by the prosecutor during closing argument, and the government in its brief to us makes no attempt to sustain the conviction under such a theory but rather argues only the sufficiency of the evidence to support a conviction under the first prong. We therefore address only that prong, that appellant "knowingly or purposefully" caused serious bodily injury to Ngong. As to that, the evidence here is entirely consistent with an argument that the gun discharged accidentally when Ngong struck it in his attempt to divert the weapon from himself. While appellant may have intentionally pulled the trigger

in response thereto, we do not think that any reasonable jury could draw such an inference beyond a reasonable doubt.

Accordingly, we are constrained to reverse the conviction of aggravated assault,[20] and otherwise remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

19. We assume for present purposes that the identification was admissible. Of course if, on remand, it is determined that the identification should have been suppressed, a new trial would be required on all the charges. The alleged unreliability of the identification is the only basis on which appellant attacks the sufficiency of his convictions for possession of a firearm during the commission of a crime of violence and of carrying a dangerous weapon.

20. Appellant was given concurrent terms of five to fifteen years of incarceration on the convictions of assault with intent to rob while armed, aggravated assault while armed, and possession of a firearm during the commission of a crime of violence. See note 1, *supra.*