Stanley R. LYONS and Jeffrey
G. Hilton, Appellants,

v.

UNITED STATES, Appellee.

Nos. 97—CF–1789, 97–CF–2036.

District of Columbia Court of Appeals.

Argued June 6, 2001.
Decided Oct. 9, 2003.

William P. Barry, with whom Jonathan L. Stern, Washington, DC, and Mack E. Davis, were on the brief, for appellant Jeffrey Hilton.

Camille M. Weithers, for appellant Stanley R. Lyons.

Ryan H. Rainey, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Pat M. Woodward, Jr. and Asuncion Cummings Hostin, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ and REID, Associate Judges.

RUIZ, Associate Judge:

Appellants Lyons and Hilton appeal their convictions of armed robbery and related weapons offenses.[1] Lyons challenges the trial court's denial of his motion to suppress his identification during a show-up after the robbery. Appellant Hilton appeals the trial court's denial of his motion for judgment of acquittal and in the alternative for a new trial, arguing that he was intimidated by Lyons, his co-defendant at trial, from testifying on his own behalf. We conclude that the trial court did not err in denying Lyons's motion to suppress and affirm his conviction, but rem and for a hearing on Hilton's motion for a new trial.

## FACTUAL SUMMARY

### I.

Jacqueline Shives testified that on May 5, 1997, at about 7:15 p.m., she was robbed at gunpoint after withdrawing money from an automated teller machine located at 12th and Perry Streets, N.E. As she was walking to her car, she noticed a man, later identified as appellant Lyons, walking towards her. Lyons pulled out a handgun and the two of them began to circle her car. At some point, Lyons grabbed her and pointed the weapon at her chest, so she threw a twenty dollar bill on the ground. Lyons picked up the bill and ran into the passenger side of a waiting black Isuzu Rodeo truck. As he jumped in, the truck sped away east on Perry Street.

Shives drove to her home on Monroe Street. After a family member called the

police, Officers Ennis and Harkins interviewed Shives at her home. Shives described her assailant as a black man in his twenties, approximately 5′9″ tall, 160 lbs., with brown eyes, short black hair, a dark and rough complexion, wearing dark pants and a royal blue sweatshirt. Shives also described the getaway vehicle as a shiny, black, two-door, Isuzu Rodeo truck with chrome. Officer Ennis left for the crime scene and, while driving there, observed a black Isuzu Rodeo with a passenger who appeared to fit the description of the robber. Officer Ennis followed the vehicle which, after a high-speed chase, crashed into a utility pole on 18th and Monroe Streets. The passenger, later identified as Lyons, exited the vehicle and ran into an alley. Officer Ennis followed him until he realized that another officer, Officer Payne had stopped Lyons in the alley.[2] Officer Ennis ordered the driver, appellant Hilton, out of the vehicle and turned him over to another officer. Ms. Shives was taken to the scene of the crash and arrest, which took place about an hour and fifteen minutes after the robbery, by Detective Harkins. She positively identified Lyons as the one who robbed her and the Isuzu Rodeo truck as the vehicle in which he had entered. Shives testified that the lighting conditions were good, as Lyons was under a streetlight and the police car's headlights were directly on him, and that when she saw him she was "one hundred percent . . . certain it was the same person [who robbed her]." When the truck was searched, the police found a red plastic cup with fifty-five dollars, including a twenty-dollar bill, a loaded black semiautomatic

---

1. Possession of a firearm during a crime of violence, carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition.

2. Officer Payne testified that at about 8:15 or 8:20 p.m. he was on the scene of a traffic accident at 18th and Kearney Streets, when he heard a crash. He learned that the crash had occurred at 18th and Monroe, so he ran north on 18th and then into an alley where he saw a person running. The person, later identified as Lyons, took off and discarded a royal blue sweatshirt.

pistol, which Ms. Shives testified at trial looked like the robber's gun, and a shotgun.

## A. Lyons's Defense

Lyons argued he was not the robber and presented an alibi defense. His brother, Dale Lyons, testified that on the day of the robbery, Lyons had been at their parents' home on Delafield Place, N.E., which is approximately one to two miles from the scene of the robbery, between 7:00 and 7:30 p.m., and that he had spoken to his brother in front of their home at 7:45 p.m. Renelle Hinton testified that on the day of the robbery, she saw Lyons enter his parents' home at approximately 7:30 p.m., and that she saw him leave the house at approximately 7:45 p.m. and speak with his brother, Dale, and then to her, before walking down the street.

## B. Hilton's Defense

The government prosecuted Hilton on the theory of aiding and abetting as the getaway driver, D.C.Code § 22–105 (1981) (recodified at D.C.Code § 22–1805 (2001)),[3] based on evidence that Hilton was driving the black Isuzu Rodeo truck with Lyons and was involved in a high-speed chase with police about an hour and fifteen minutes after the robbery, and that a gun and a twenty dollar bill were recovered from Hilton's truck.

Hilton did not offer any witnesses, but presented three exhibits that he claimed called into question that he was the driver of the getaway car: a portion of the PD 251 report that described the getaway vehicle; Shives's grand jury testimony describing the vehicle as having chrome and two doors, whereas the Isuzu Rodeo he was driving had four doors and did not

have chrome; and a stipulation that the high-speed chase began shortly after 8:30 p.m.

## C. Pre–Trial Motion to Suppress Identification

Appellant Lyons filed a pre-trial motion to suppress the show-up identification, arguing that the identification procedure was unduly suggestive and based on an unreliable witness. Officers Harkins, Ennis, and Payne testified for the government about the initial interview with Ms. Shives and the identification procedure. They said that Ms. Shives had given a detailed description right after the robbery and that she was certain when she identified Lyons at the show-up. After a hearing, the trial judge denied the motion to suppress, finding that he was "struck by [Ms. Shives'] [above-average] observations in this case," and that "there [was] nothing about the length of time between the incident and the show-up ... [or] the conduct of the show-up itself that gives any hint of the show-up having been unduly suggestive." He concluded that the procedure was not "outside the routine show-up," and was "reliable in all the circumstances."

## D. Post–Trial Motion for New Trial

After being convicted on September 26, 1997, Hilton filed a renewed motion for judgment of acquittal, or in the alternative, a motion for a new trial, arguing that the evidence against him was insufficient to sustain a conviction and that he should receive a new trial because he was intimidated to testify in front of his co-defendant. The motion noted that Hilton had "no impeachable convictions." In the motion Hilton asserted his innocence and explained that Lyons only came into his com-

---

3. D.C.Code § 22–105 states in pertinent part:
 In prosecutions for any criminal offense all persons advising, inciting, or conniving at

the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories...

pany after the robbery because Hilton was "giving Lyons a ride." If he had testified, Hilton would have explained that he had tried to escape from the police because Lyons told him he "had fucked up" and had a gun; Hilton also knew he had a shotgun in the back. The motion also asserted that in a separate trial, Hilton would have called others to vouch for his whereabouts at the time of the robbery, but at the joint trial he was afraid to do so and implicate Lyons, his co-defendant. In the motion, defense counsel argued that he was personally "hamstrung" in presenting witnesses, because any truthful testimony tended to implicate the co-defendant and defeat his defense and that Hilton was not willing to do that. Hilton also would not testify because he refused to support Lyons's defense that he had never been in the Isuzu Rodeo truck. Nor was counsel willing to call witnesses who would testify to Lyons's bogus defense. Counsel pleaded with the court, stating he "struggled with this issue" throughout trial and that he was "gravely concerned that Mr. Hilton has been wrongfully convicted ... because of the unusual dynamic of this co-defendant trial." In counsel's opinion, "Lyons called the shots in this case and he dragged Hilton down with him ... [and] at a separate trial Mr. Hilton could have offered a convincing alternative to the government's circumstantial case."

The trial court denied the motion without a hearing, ruling that the evidence was sufficient to convict, and that appellant had not presented specific evidence to support his claim of fear of or intimidation by his co-defendant that required, in the words of the trial court, "heightened application of a *Geddie*[4] analysis." The trial court commented that "[d]espite claiming a 'fear' [Hilton] never states exactly what he was afraid of, let alone that this fear was triggered by threats, intimidation or duress from co-defendant Lyons." The trial court noted that there was nothing in the trial record to support Hilton's claim that he was afraid and that his pre-trial motion to sever defendants had given a different reason.[5] The court viewed "the motion as merely an expression of [Hilton's] counsel's regret over his client's choice of strategy employed at trial," and denied the motion for new trial.

## ANALYSIS

### II.

#### A. Lyons's Motion to Suppress

 We turn, first, to appellant Lyons's motion to suppress identification evidence. On appeal from a denial of a motion to suppress, we review the legal conclusions of the trial court *de novo* and defer to its findings of fact. *See Maddox v. United States*, 745 A.2d 284, 289 (D.C. 2000). The court must view the evidence presented at the suppression hearing in the light most favorable to the government, and draw all reasonable inferences in the government's favor. *See Womack v. United States*, 673 A.2d 603, 607 (D.C. 1996).

---

4. *Geddie v. United States*, 663 A.2d 531, 534 (D.C.1995).

5. The pre-trial motion for severance of defendants argued that if the trials were severed, Lyons, who chose not to take the stand in his own defense, could offer testimony exculpating Hilton. After a hearing, the trial court denied the pre-trial motion to sever. In his second supplemental brief Hilton argued that the trial court erred in denying his pre-trial motion to sever defendants because Lyons would have testified at Hilton's trial and exculpated him if their cases had been tried separately. Hilton's counsel abandoned this argument at oral argument.

Out-of-court identifications and testimony concerning them are examined under a two-part inquiry. *See Turner v. United States,* 622 A.2d 667, 672 (D.C. 1993).

> The first inquiry is whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification," and if so, the second inquiry is whether the identification is nonetheless sufficiently reliable.

*Id.* at n. 4, quoting *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). If the trial court finds undue suggestivity, it must then determine whether the identification was none the less reliable. *See United States v. Hunter,* 692 A.2d 1370, 1376 (D.C.1997).

The "appearance that the suspect is in custody does not necessarily make an identification so suggestive as to create [a] substantial likelihood of misidentification where the show-up takes place at the scene of the crime within a short period of time after the incident." *See Turner,* 622 A.2d at 672. Even though we recognize the potential for suggestivity in a single person show-up, we repeatedly have upheld the admission of identifications from a show-up carried out soon after the commission of the crime because prompt show-ups enhance the reliability of an identification. *See, e.g., Hunter,* 692 A.2d at 1375.

In the instant case, when Ms. Shives identified Lyons, he not only was in custody, but in handcuffs and under the high beams of a police car. Although these factors have the potential for making the show-up more suggestive than usual, we agree with the trial court's finding that ultimately the procedure was not unduly suggestive and the identification was reliable. Any potential for suggestivity was outweighed by the promptness of the show-up, which took place about one hour and fifteen minutes after the robbery. Moreover, there was good lighting and involved a victim who had already given a detailed description of the robber, noting his height, weight, race, and clothing.[6] Even if we were to think that the procedure was unnecessarily suggestive, however, we are satisfied that the identification was reliable. *See Turner,* 622 A.2d at 672 (noting that assuming the show-up created substantial likelihood of misidentification, the trial judge could properly conclude that identification was still reliable and admissible.) Ms. Shives testified at trial that she had looked at the robber several times during the robbery when he was chasing her around her car. She stated, and Detective Harkins confirmed, that during the show-up she was able to observe appellant under good lighting and was certain of her identification.[7] *See generally id.* at 673 (noting that an on-the-scene identification may be appropriate where witness has sufficient opportunity to observe the person and has a vivid impression of characteristics such as height, race, and clothing); *Jones v. United States,* 277 A.2d 95, 98 (D.C.1971) (discussing that although confrontation may have been suggestive, victim's description was detailed and memory was fresh somewhat more than an hour after her purse had been snatched). Therefore, there was no error in the trial court's denial of the motion to suppress.

## B. Hilton's Motion for New Trial

We turn to Hilton's contention that the trial court erred in denying, with-

---

6. The trial judge noted, "I am absolutely ... struck by the sharp observations that this woman made under stressful circumstances."

7. Ms. Shives testified that the person had the "same face, same hair, same shoes."

out a hearing, his motion for a new trial[8] claiming that he should be tried again, separate from his co-defendant, so that he could testify free from intimidation. Under Superior Court Criminal Rule 33, the trial court "may grant a new trial ... if required in the interest of justice." Super Ct.Crim. R. 33.[9] In applying the interest of justice standard where the defendant claims the right to present additional evidence, the trial judge who heard the trial evidence, sits as the "thirteenth juror" to determine "whether a fair trial requires that the [additional evidence] be made available to the jury." *Herbin v. United States,* 683 A.2d 437, 441 (D.C.1996), citing *Godfrey v. United States,* 454 A.2d 293, 299 (D.C.1982) (internal citations omitted).[10] When the convicted defendant claims that he was under duress from or intimidated by his co-defendant—and thus prevented from putting on exculpatory evidence at trial—the trial court is presented with a "colorable claim for relief." *Geddie,* 663 A.2d at 534. Where the trial court

8. We affirm the ruling of the trial court denying Hilton's motion for judgment of acquittal, holding that the evidence was sufficient for a reasonable jury to find the appellant guilty beyond a reasonable doubt. This court reviews the sufficiency of evidence under the same standard as the trial court—in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact ...." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987).

In this case, the jury was fully instructed on the government's theory that Hilton aided and abetted the armed robbery. *See* D.C.Code § 22–105. To prove aiding and abetting the government must prove: 1) that an offense was committed by someone; 2) that the accused participated in its commission; and 3) that he did so with guilty knowledge. A person need not be personally present during the commission of the offense to be found guilty of aiding and abetting. *See Murchison v. United States,* 486 A.2d 77, 81 (D.C.1984). The evidence before the jury, though not overwhelming, supports an inference that Hilton aided and abetted Lyons in committing the robbery by helping him escape as the driver of the black Isuzu Rodeo. A reasonable juror could infer from the evidence presented that he was waiting in the car for the crime to be committed and then helped Lyons to escape. *See generally United States v. Harris,* 140 U.S.App. D.C. 270, 285, 435 F.2d 74, 89 (1970) (appellant's apartment was used as meeting place for robbers and his car was used as a getaway vehicle); *Prophet v. United States,* 602 A.2d 1087, 1092 (D.C.1992) (holding that evidence that defendant knew that codefendant was armed and his affirmative response to query whether he wanted victim's radio helped set in motion events that culminated in robbery). Appellant then engaged the police in a high speed chase and, once his car was forcibly stopped, the police found money and guns in the car. Although there is no direct evidence that appellant was in the car when Shives was robbed or had the specific intent to commit robbery, and there was a significant lapse of time between the robbery and the chase and crash of the Isuzu Rodeo, when viewed in the light most favorable to the government, the evidence was sufficient to withstand a motion for judgment of acquittal.

9. Rule 33 permits such motions to be filed "within 7 days after verdict or finding of guilty or within such further time as the Court may fix during the 7–day period." Super. Ct.Crim. R. 33. In this case, after the jury rendered its verdicts on September 5, 1997, the trial court set September 26, 1997, as the deadline for any post-trial motions. Hilton's motion for a new trial was therefore timely. *But see Geddie,* 663 A.2d at 535 (noting that "most suitable means" is to bring the matter to the court's attention, if necessary *ex parte,* before or during trial).

10. In denying Hilton's motion for a new trial, the trial court stated that "a defendant would have to show that an acquittal would necessarily follow from these circumstances." In *Huggins v. United States,* 333 A.2d 385, 387 (D.C.1975), we stated that showing an acquittal would follow is a *factor* in requiring a new trial, not a requirement for a new trial. *See id.* at 387. The trial court's misstatement is of no moment in this appeal, however, because it was not the basis of the trial court's ruling.

denies the motion "out of hand," without exploring the claims of intimidation or stating any reasons for denying the motion, there is an abuse of discretion. *Id.*

This is not a case like *Geddie* where the trial court denied the motion "out of hand," without giving an explanation. *Id.* The trial court explained that appellant's claims were not supported by reference to specific instances of intimidation, and had not been raised when severance was sought pre-trial. Although we agree with the trial court that appellant's motion should have been more detailed and included affidavits, *cf. id.* at 533 (motion recited "open and veiled threats" against defendant, his family and a witness, and that defendant had "reason to believe" co-defendant's threats should be taken seriously), we disagree that appellant's motion did not present a colorable claim. The motion clearly set out that Hilton was "afraid . . . to truthfully testify about his own innocence" and it was "the co-defendant's influence [that] kept [Hilton] from the stand." The motion explained the pressures on Hilton and proffered what his testimony would have been. We consider the personal representations of defense counsel in the motion as a proffer that at a hearing he would have testified that his client was being intimidated by his co-defendant.[11] Although the trial judge pointed out that Hilton had given different reasons pre-trial and post-trial for wanting to be tried separately

from Lyons,[12] we note that defense counsel's representations in the motion are consistent with counsel's statements pre-trial that his client was "afraid [to] work[ ] out the case unless the other co-defendant does." On this record, the inconsistency and delay are insufficient to deny the motion. *But see Geddie,* 663 A.2d at 535 (noting that delay in presenting claim of intimidation may raise questions about its credibility). Other reasons give us pause. Many considerations can influence a defendant not to take a stand, but an obvious one—impeachment with prior convictions—was not a factor here. We also take into account that counsel expressed that he was "gravely" concerned that his client was wrongfully convicted, and that Hilton asserts that he is innocent. Hilton's proffered defense is not so implausible that it could not be believed by a jury, or create a reasonable doubt about his guilt as an aider and abetter. *Cf. Geddie,* 663 A.2d at 533 (defense that undercover officer who bought heroin from defendant was "confused" in his identification of defendant).

"Our decision in *United States v. Hamid,* 531 A.2d 628 (D.C.1987), establishes that a claim of duress or intimidation by a co-defendant may entitle a defendant to some form of relief," and "warrant[s] the court's serious consideration." *Id.* at 534.[13] Based solely on the written motion,

11. Mark Rochon represented appellant at trial. The motion he filed on appellant's behalf was uncommonly personal and compelling: Counsel struggled with this issue throughout his pre-trial preparation and throughout the trial itself. Perhaps counsel should have raised it directly with the Court. But the fact is that counsel believes Mr. Hilton was convicted only because he was afraid to tell the truth. Indeed, this Motion is itself more strongly worded than Mr. Hilton might like, but counsel takes the blame for pointing out what he suggests is obvious to the other attorneys in this case: Lyons

called the shots in this case and he dragged Hilton down with him.

12. At oral argument, counsel explained that the duress argument was not raised before trial because Lyons had indicated that, if the trials were severed, he would testify on Hilton's behalf. In the absence of a hearing record on the issue, we rely on this representation of counsel, as an officer of the court.

13. The trial court ruled that because appellant did not specify instances of threats or intimidation from his co-defendant, his claim

we cannot seriously evaluate appellant's claims or his entitlement to relief, nor could the trial court. We hold that the trial court abused its discretion in summarily denying Hilton's motion for a new trial without a hearing to determine if appellant's claims of fear and intimidation were credible. A hearing will provide an opportunity to ask Hilton why he was afraid of Lyons to the point that he was intimidated not to testify in his own defense, and for the trial judge to evaluate Hilton's demeanor and credibility. Hilton's trial counsel also may need to be called as a witness. Only then can the trial judge weigh the nature of appellant's fear, appellant's potential testimony in a new trial and, ultimately, whether, sitting as the "thirteenth juror," the trial judge believes that in the absence of his testimony, appellant was denied a fair trial. But at this juncture, in light of the circumstantial government case against Hilton, and the lapse of time between the robbery and the chase, his testimony about why Lyons was in the car with him and why he sped away when the police spotted Lyons and gave chase, if believed, could have impacted the verdict in his case. Under *Geddie's* "heightened analysis," it is possible that appellant was denied his right to a fair trial. *See Geddie,* 663 A.2d at 534. ("Because the alleged intimidation presented the possibility that appellant was prejudiced in his right to a fair trial ... we must remand this case ... for further consideration.") (quoting *Wilson v. United States,* 380 A.2d 1001, 1004) (D.C.1977) (Nebeker, J., concurring).

For the foregoing reasons, Lyons's conviction is affirmed. Hilton's conviction is reversed and remanded for further consideration by the trial court.

*So ordered.*

FARRELL, Associate Judge, concurring.

I agree fully with the court's disposition of Lyons' appeal. As to Hilton, I concur reluctantly in the remand for a hearing. The court says that at a hearing the trial judge can "evaluate Hilton's demeanor and credibility," *ante* at 489. But credibility as to what? We presently have no idea what Hilton would say on the stand, since he personally has furnished no affidavit or other statement asserting a basis for the claim of intimidation. His counsel suggests that Hilton is afraid to substantiate the claim ("[T]his motion is itself more strongly worded than Mr. Hilton might like."), so we are left to assume that—just perhaps—at the hearing Hilton will have overcome his fear and be ready to recite the objective basis for the coercion Lyons supposedly worked upon him. That, as I see it, is an insufficient showing to require the judge to convene an evidentiary hearing.

On the other hand, trial counsel's motion, read very generously, implies that he himself witnessed interactions between the codefendants or was told things by Hilton (which might be admissible as going to the client's state of mind) that could support a claim of duress or intimidation.[1] That is

---

for relief was not entitled to "a heightened *Geddie* analysis." As noted, what is required is a serious exercise of the judge's discretion, not a "heightened analysis." We do not prescribe the manner in which discretion is to be exercised. A hearing is not always required. *See Prophet v. United States,* 707 A.2d 775, 779 (D.C.1998). But where, as here, there are claims of intimidation that, if believed,

would warrant relief, a final determination can be made only after an evidentiary hearing—as with any other case where a material fact, grounded on credibility, must be established.

1. I say read "very generously" because counsel's motion is filled with elusive and conclusory language about "the unusual dynamic of

enough to justify a hearing, though barely. Ultimately, however, unless Hilton's own words—not his counsel's—impeached by his failure to utter them at any time earlier, *see Geddie v. United States,* 663 A.2d 531, 535 (D.C.1995) (discussing means by which defendant can timely bring intimidation to court's attention without danger of retaliation), persuade the trial judge that duress rather than an unsuccessful choice of strategy likely dictated his defense, the hearing will be as predictable in outcome as it may be brief.

REID, Associate Judge, concurring.

I fully appreciate Judge Farrell's reluctance to remand Mr. Hilton's case for further consideration by the trial judge who ably handled a challenging co-defendant trial. I believe that Judge Ruiz is correct, however, that this disposition is directed by our case law. In the final analysis, the concept of a "fair trial" compels us to take what, at first blush, appears to be an unnecessary step. But, we are required to ensure that fear and intimidation did not contribute to Mr. Hilton's conviction. Thus, I join Judge Ruiz's disposition of Mr. Hilton's case without hesitation.

this co-defendant trial" in which "Lyons called the shots and he dragged Hilton down with him," and where—without further specification—"the co-defendant's influence ... kept Mr. Hilton from the stand."